# ESTATE OF MAHLON MILLER, DECEASED.

APPEAL BY DAVID MILLER ET AL. FROM THE ORPHANS' COURT OF BERKS COUNTY.

Argued March 5, 1890—Decided October 6, 1890.

[To be reported.]

1. When one has rendered personal services to another, merely upon the expectation of a legacy promised, without a contract obligation, the promisee takes his chances of receiving the legacy, and if his expectations are disappointed he can recover nothing.

2. To sustain a claim against the estate of a decedent, for services rendered under an alleged contract to pay for them after death, either specifically or by way of a legacy, it is indispensable that there be proof of the services actually rendered.

3. Evidence, in support of such a claim, which fails to show either the terms of a definite contract to pay, or what services were rendered from which a contract to pay can be implied, is insufficient to authorize the allowance of payment.

Before PAXSON, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 308 January Term 1890, Sup. Ct.; court below, number and term not given.

Adjudication.

On April 8, 1889, David and William Miller, administrators of the estate of Mahlon Miller, deceased, settled their first account in said estate, which on June 3, 1889, was called for audit before SCHWARTZ, P. J.

At the hearing, Israel Miller presented a claim against the estate for $5,000, upon an alleged contract with the decedent, for services rendered and to be rendered by the claimant. The testimony of witnesses called by the claimant tended to show that he and the decedent were not related; that they lived part of the time a half mile, and afterwards two and one half miles from each other; that the decedent sometimes boarded with the claimant, and the claimant sometimes brought provisions to the decedent; that the decedent at different times declared to other persons that the claimant had rendered service to him in the way of work and the use of horses and he owed the claimant $5,000 for his services, was going to give him that sum and had promised him to do so, in some instances stating that he was going to give him the $5,000 after his death. One witness, Augustus Fritz, testified to a conversation, in his presence, between the decedent and the claimant, in the fall of 1886, in regard to the work that the claimant had done, in which the decedent asked the claimant if he would be satisfied with $5,000; that the claimant replied that he would, and the decedent then said, " I will give you the $5,000 if you are satisfied." There was testimony that some time in 1887 the decedent made a will in which he bequeathed $5,000 to the claimant, but about four or five months afterward he destroyed it, and died intestate, April 28, 1888. The testimony relied on to establish the claim is fully quoted in the opinion of the Supreme Court, infra.

After hearing and argument, an adjudication was filed as follows:

Counsel for Israel Miller presented a claim against the estate of $5,000, founding the same upon an express contract with the decedent for services rendered and to be rendered, horse hire, and for other causes and reasons rendered and furnished by the claimant to the decedent. The question for consideration is, is he entitled, under the evidence, to the $5,000, or only to the value of his services, horse hire, etc.?

Our courts appear to have divided cases of this kind into

two distinct classes.   In cases where it is established by " direct and positive " testimony that the services done, the things given and supplied, were to be compensated by a fixed sum of money, or by any specified goods, or by the conveyance of certain lands, the measure of damages for the non-performance of the agreement is the amount of money promised to be paid, a sum of money equal to the value of the goods or the value of the lands.   Bash v. Bash, 9 Pa. 260, decides that where a son remains with his father after his majority, and upon an express contract that he would leave him his farm for the services at his death, the measure of damages for the non-performance is the value of the lands.   McDowell v. Oyer, 21 Pa. 417, is to the same effect.   Thompson v. Stevens, 71 Pa. 161, decides that where a decedent in his lifetime agrees with his servant to provide for her at his death, to the extent that she need not thereafter do any work for a living, the contract is to be literally fulfilled, and the measure of damages for the non-performance thereof is a sufficient sum of money to keep and maintain her in accordance with the terms of the contract.   Snyder v. Castor, 4 Y. 353, is to the same effect. In all cases in which the evidence is less definite, direct and positive, as to the consideration, the rule of law is, that the damages for the breach of contract are the value of the services upon a quantum meruit: Graham v. Graham, 34 Pa. 475.   The question here arises, under which of these classes does the case under consideration fall ?

The facts submitted by the evidence are as follows : Augustus Fritz testified that " decedent told him in the fall of 1886 he would not pay Israel Miller for the things he was getting, but would give him $5,000 for what he got of him, but would not pay him in his lifetime.   He further says that in Mahlon Miller's room, " I heard Mahlon and Israel speaking together about this matter, and Mahlon then said he would give Israel $5,000, and asked Israel if he would be satisfied with that, and Israel said he would."   The same witness also says that Mahlon told him he had promised Israel $5,000 for services.   Upon cross-examination, witness said that he, addressing Israel, asked, " if I give you $5,000 will you be satisfied ?   Then Israel replied, "if you give me $5,000 I will be satisfied," and that

Adjudication.

Mahlon answered that he would give him $5,000; and further said that the subject was broached by the decedent.

This testimony is strongly corroborated by Benjamin F. Smith, Edward Sheetz, Franklin James, Joseph H. Houck and I. C. Becker, all of whom testified that he told them he owed Israel Miller $5,000 for services rendered, horse hire, boarding, sending him victuals, and for good and kind acts done and shown him. Several of them also testified that he had admitted to them he had promised Israel Miller to pay him $5,000, after his death, for what he gave him and did for him.

This testimony, exclusive of that of Benjamin F. Smith, which is somewhat impeached, is direct and positive, strongly supported by admissions and declarations of the decedent. It clearly shows, beyond any doubt, that [the decedent had an express contract with the claimant to pay him $5,000, after his death, for such services as the claimant had or might render him, etc. The claimant accepted decedent's terms; that is, he did not ask for a settlement during his lifetime, and now looks for his $5,000 as per contract between them.] [1]

The question of want of consideration is also raised. It is, however, too evident to admit of argument that claimant rendered service to the decedent, and that he was also otherwise indebted to him. The evidence does not disclose the amount of such indebtedness, but certainly shows a sufficient consideration to sustain an express contract.

In passing upon this question, it is proper to take into consideration the decedent's habits of life and characteristics. He was old, when he entered into this contract; peculiar, a bachelor, somewhat bitter towards some of his relatives, living at times by himself, doing his own cooking and housekeeping, and fond of money making. It is also fair to conclude from the evidence that he desired the friendship of the claimant to the end. Hence he dreaded a settlement with him; fearing a disagreement between them, and having use for him, he contracted in settlement of the claim for the payment of $5,000 after his death.

The court allows the entire claim of $5,000.

The foregoing adjudication was filed December 4, 1889, and

confirmed nisi. No exceptions being filed thereto, the confirmation became absolute; whereupon the administrators, and William Miller, on behalf of himself and the other heirs of the decedent, took this appeal, specifying that the court erred:

1. In making the finding embraced in [ ] [1]

2. In awarding $5,000 to the claimant.

*Mr. D. E. Schroeder* and *Mr. Jeremiah Hagenman*, for the appellants:

1. The court below was unfortunate in its citation of authorities. Bash v. Bash, 9 Pa. 260, in so far as it appears to sustain the court, and McDowell v. Oyer, 21 Pa. 417, belong to the line of cases following Jack v. McKee, 9 Pa. 235, which are overruled in Hertzog v. Hertzog, 34 Pa. 418. A comparison of the testimony with the findings of the court will show great inaccuracies and unwarranted inferences and presumptions in the latter. There is no proper and sufficient evidence of any such agreement as the court finds, nor is it shown that the claimant continued to render services down to the decedent's death. The testimony of Fritz presents the only direct evidence of anything like an agreement, but it does not constitute clear and satisfactory proof of a contract between the parties, like the express contract found by the court: Hertzog v. Hertzog, 29 Pa. 465; 2 Bouv. Law Dict., 204; Kyle v. Wells, 17 Pa. 290.

2. Such a contract, as is alleged here, should be proved by direct and positive evidence, and its terms must be definite and clear: Hertzog v. Hertzog, 29 Pa. 465; Graham v. Graham, 34 Pa. 475; Hartman's App., 3 Gr. 276; Pollock v. Ray, 85 Pa. 428; Bash v. Bash, 9 Pa. 262; Thompson v. Stevens, 71 Pa. 161; Murray's Est., 24 W. N. 175. The indefiniteness of this alleged contract, as to the services to be compensated, prevents its enforcement: Walls' App., 111 Pa. 460. One who performs services for another in expectation of a legacy, cannot recover therefor: Little v. Dawson, 4 Dall. *111. It was unnecessary to file exceptions to the adjudication. The court below being a separate Orphans' Court, its adjudication itself is a definite decree from which an appeal lies: Rhoads's App., 39 Pa. 186.

Opinion of the Court.

*Mr. John F. Smith*, for the appellee:

1. No exceptions were filed in the lower court to its findings, and therefore this court is not obliged to review the testimony unless the justice of the case requires it: Hise's Est., 5 W. 157; Irwin's App., 5 Wh. 577; nor, unless gross error has been committed: Piper's App., 20 Pa. 67. The court must have found full performance of all the services contemplated by the contract. Every fact essential to the decree must now be presumed to have been found. Moreover, the findings are fully justified by the uncontradicted testimony.

2. In none of the cases cited by the appellant was there an express contract in which the parties came face to face. There can be no question in this case as to the mutuality of the obligation. The claimant was bound to accept the $5,000 as a full compensation for his services, and the decedent, or his representatives, to pay that amount. In Thompson v. Stevens, 71 Pa. 161, a verdict for $10,000 was sustained upon evidence far less definite than in the present case.

OPINION, MR. JUSTICE GREEN:

The appellee, in support of his claim against the decedent's estate, examined five witnesses. The last of them, Jesse H. Houck, testified as follows: "I knew Mahlon Miller since 1848. He told me that he had promised Israel $5,000; that he was burnt out and had a big loss, and 'I am going to make him better off than he was before.' He said Israel had done a good many things for him: if he wanted anything he could go just there and get it as if Israel was at home. I know Israel brought him provisions. I could not tell what kind; he had it in a basket or bucket. . . . . I understood, from what Mahlon said, he was going to leave Israel $5,000 after his death, in his will. . . . . He told me this often." It is scarcely necessary to say that the testimony of this witness does not exhibit a single element of a contract liability. It is, at the utmost, proof only of a declaration of the decedent that he intended to give a legacy of $5,000 to the appellee, which intention he did not execute. It is, however, of some value in considering a portion of the testimony of the other witnesses. The promise was not made to the appellee, but to a stranger, and appears to have proceeded from a desire to make a gift to the appellee,

to make up a loss by fire which he had sustained. In no possible view of the case, can this testimony be regarded as in the least degree supporting the claim of a contract relation.

The next witness for the appellee was Franklin James, who testified: "I was acquainted with Mahlon Miller; knew him twenty years. He told me that he owed Israel $5,000 for the good services he had done him. Cross-examined: Israel never heard him say this to me. Mahlon said Israel had been good to him, had done him a good many favors, never made a demand on him; and that he was going to give him $5,000. . . . . He told me that he had told Israel; that he spoke with Israel and promised him $5,000 for the work he had done for him; and he had been good to him, and could get a horse whenever he wanted one." Had there been real proof by other testimony of actual service rendered by appellee to the decedent, at all approximating the value of $5,000, this testimony would have afforded a slight inference that the decedent was inclined to give that amount to the appellee, whether as a donation or as compensation cannot be told from this testimony, but as there is no such evidence anywhere in the case, there is no basis for such an inference. As the witness says the decedent told him that Israel never made a demand on him, that he was going to give him $5,000, it really proves nothing more than an unexecuted promise to make a gift.

The next witness for the appellee was Edward Sheetz. He said: "I was acquainted with Mahlon Miller; knew him very well; he lived with us four months in 1886. He said he was going to give him $5,000; he had been good to him. He hired his horse from him; whenever he came for a horse he (Israel) never refused him. He always said he had promised Israel $5,000, and he should have it, but he did not specify any time. . . . . He never said he was going to give Israel $5,000; he said he owed it to him and was going to give it to him. He never said this to Israel in my presence." The whole substance of this testimony is that decedent told the witness that he was going to give Israel $5,000, without specifying any time. The only reason assigned by decedent, according to this witness, for his intention to give $5,000 to Israel, was that Israel had been good to him, and that he hired a horse from Israel whenever he wanted one. Neither the actual perform-

ance of any service for the decedent, nor the terms of any contract for the payment for such service, nor the time when the $5,000 was to be given, nor whether it was to be in Mahlon's lifetime or by way of a legacy, nor the fact that it was to be done in pursuance of any contract between them, appears in the testimony of the witness, and hence it must be discarded for any useful purpose in the case.

The next witness was B. F. Smith, who testified: "I knew Mahlon Miller; he was not married. His method of living was very peculiar. He lived by himself; he lived like a hermit, and had plenty of money." After detailing a trifling conversation which he had with decedent on the road, one day, he said, speaking of decedent in that conversation: "He says, 'I am indebted to Israel Miller, at Douglassville, Dutch Is., $5,000 for what he has done for me.' I says, 'Why, how do you owe him that much? What did he ever do for you?' He says, 'I guess I can do as I please with my money.' I said, 'Yes, it would come very handy to Is.; he was burnt out and lost all he had in the barn.' He says, '$5,000 would fix him better than he was before he was burnt out.' I then asked him what he owed him this money for. He said for horse-hire, board, etc. He said he never handed in his bill. When I told Mahlon Miller about Israel's having been burnt out, Mahlon said, 'I owe him $5,000, and that will make him better than he was before.' In the conversation he said he told Israel Miller that he was going to give him $5,000; that Israel was aware of it and he was to have it." This testimony is like the rest; not a word about a contract for the payment of services actually rendered, nor any statement of the terms of such a contract, nor anything said as to when or how the money was to be given; but quite a distinct statement that what decedent said was, that he was going to give Israel the $5,000 because he had a right to do as he pleased with his own. As this is nothing but a promise, a statement of an intention merely, to give Israel a sum of $5,000, it goes for nothing more than an unperformed intent to give a legacy.

The only remaining witness, and the one whose testimony was chiefly relied upon by the learned court below, was Augustus Fritz. After stating that he was intimately acquainted with decedent, he was asked if he knew of any arrangement

Opinion of the Court.

or contract between Mahlon Miller and Israel Miller, and he answered: "Israel Miller done some work for decedent, a good deal of work, and if he wanted a horse or anything, he would just go into the stable and take one. Decedent boarded there considerable. Israel took provisions to decedent; decedent told me that he would not pay Israel for the things he was getting, but he would give him $5,000 for what he got of him, but would not pay him in his lifetime. Mahlon Miller did not say that he had any arrangement with Israel about these things, but he said he would give him $5,000 for what things he had of Israel. In Mahlon Miller's room I heard Mahlon and Israel speaking together about this matter, and Mahlon then said he would give Israel $5,000, and asked Israel if he would be satisfied with that, and Israel said he would. Yes, Mahlon told me he had promised Israel $5,000 for his services." After stating that at one time Israel lived about half a mile from Mahlon, but now he lived about two and a half miles from him, he said: "I only knew from what decedent told me himself, that Israel did a great deal of work for him; decedent told me many a time, he told me about two years ago; decedent boarded with Israel off and on; all I know is what Mahlon told me about the services. Mahlon told me that Israel brought provisions to him; Mahlon told me that he would not give Israel anything for his services, but he would leave him $5,000 after his death. . . . . What I mean by provisions, in my testimony, is that Israel brought cooked things to Mahlon's house while he was sick. . . . . I knew him forty years; lived in the same neighborhood. He worked for me and I worked for him. During the last five years Mahlon used to speak to me about Israel. It was during this five years Mahlon used to tell me he was going to give Israel $5,000, and Israel must have done the work before that time. I don't know that Israel worked for Mahlon during the last five years of his life." If the testimony of the other witnesses had possessed any virtue as establishing a contract relation between these parties, it was entirely destroyed by the testimony of this witness. He testified emphatically, distinctly, and positively, that decedent told him he would not pay Israel for what he got of him, in his lifetime, but would give him $5,000 after his death; that he did not say he had any arrangement with Israel about these things,

but he would give him $5,000 for what he had of Israel. According to this witness there was to be no payment of anything during Mahlon's life, but he said there was a promise to give $5,000 after death.

If this was a contract and actual service had been performed on the faith of it, the performance of the service would be a good consideration for the promise, although the money was not to be paid till after death. But there are two radical difficulties in the way of the application of that doctrine. The only witness who testifies to it says the services must have already been performed before the time of the promise, and that he did not know of any work done by Israel for Mahlon after that time. And the other great overshadowing obstacle in the way of recovery, is the utter absence of proof of the services. It is perfectly manifest that the claim cannot be sustained upon the footing of an express contract, with definite terms for the payment of money during the life of the decedent, for any services, or any other consideration, because there is no proof of such a contract. It is equally clear that as a mere promise to give $5,000 by way of a legacy, it cannot be sustained, because, if the service, whatever it was, was rendered merely on the expectation of a legacy, the promisee takes his chances, and if he is disappointed he can recover nothing: Pollock v. Ray, 85 Pa. 428; Thompson v. Stevens, 71 Pa. 161; Neal v. Gilmore, 79 Pa. 421. But to sustain the claim upon the ground that the alleged promise was to pay after death, either specifically or by way of a legacy, it is indispensably necessary that there should be proof of the services actually rendered. We have searched this record in vain for proof of such services. The decedent was an unmarried man, living by himself, and continued to do so until the time of his death. The appellee lived at a distance from him; once as close as half a mile, and also at a distance of two and a half miles. There was no proof of services by way of nursing, or taking personal care of decedent, or even that he was sick or infirm so as to require such care. What services the appellee rendered to decedent we are not told by any witness in the case. Fritz says: "Israel Miller done some work for decedent, a good deal of work," but that is all. What the work was, or how much of it there was, or when it was done, or how long it

continued, he does not pretend to say, and these subjects must all be left to the imagination. Whether it was common day labor or the work of a mechanic is not stated, but whatever it was, Fritz says he does not "know that Israel Miller worked for Mahlon during the last five years of his life." Now, Fritz lived in the same neighborhood with decedent, and if Israel was doing work for Mahlon he had ample opportunity to see it; but he says he only knew from what Mahlon told him that Israel had done work for him. Not a solitary witness testifies that he ever saw Israel doing any work of any kind for Mahlon, or had any knowledge upon that subject. It is absolutely impossible, now, to discover a single fragment of testimony upon this whole record that any actual, real work or service of any kind was ever done by the claimant for the decedent. There was a little testimony about some boarding and horse hiring, furnished to the decedent by the appellee, but it is of the most shadowy and uncertain character, and not described by any one having personal knowledge. Moreover, there is not a particle of proof how much boarding there was, nor how often a horse was hired; and if this were an action to recover upon a quantum meruit, no basis of proof could be found upon which to fix any definite amount of compensation whatever.

The plain truth about this claim is, that it is one of the worst and weakest in substantial merit that ever gets into the courts. In the great majority of this class of cases there is abundant proof of actual service rendered, and the difficulty lies in defective proof of a specific contract, or in the family relation of the parties. But here is an utter failure to prove the fact of any services whatever actually rendered. It is eminently one of the numerous class of cases which we have so often condemned, in which claims are preferred against dead men's estates after the principal party is in his grave, never presented while he was living, and generally supported by loose, uncertain, oral testimony of declarations and admissions of the most unsatisfactory character. Our continuing experience warns us against them, and we do not propose to relax the rules which we have frequently expressed for dealing with them. It is not unlikely that the decedent had expressed an intention to give the appellee a legacy of $5,000 out of his estate, and there was some testimony to the effect that he did once

Syllabus.

execute a will with such a legacy contained in it, but he subsequently destroyed that will and died intestate. But a disappointed claim for a legacy cannot be compensated by setting up an unfounded claim for alleged services, without lawful testimony to support it. We are of opinion that the claim of the appellee should have been rejected.

> The decree of the court below is reversed at the cost of the appellee; and the record is remitted with instructions to strike out the allowance of $5,000 to Israel Miller from the distribution, and correct the account accordingly.