No. 41,684

In the Matter of the Estate of Gertrude McCourt Shirk, Deceased.
(BETTY SHIRK O'BRIEN, *Appellant,* v. WILLIAM S. SHIRK, Executor,
*Appellee.*)

(350 P. 2d 1)

Opinion filed March 5, 1960.

*Evart Mills,* of McPherson, argued the cause and was on the briefs for appellant.

*Emmet A. Blaes,* of Wichita, argued the cause, and *James A. Cassler,* of McPherson, and *Roetzel Jochems,* of Wichita, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This proceeding was commenced in the probate court of McPherson County, Kansas, against the estate of a decedent for the specific performance of an oral contract.

The will of the decedent, Gertrude McCourt Shirk, was admitted to probate in McPherson County on October 17, 1957, and the

executor's notice to creditors was first published on October 19, 1957.

On July 14, 1958, five days before the running of the nonclaim statute (G. S. 1949, 59-2239), the appellant, Betty Shirk O'Brien, the only daughter of Gertrude McCourt Shirk, filed her petition for allowance of demand against the decedent's estate based upon an oral contract that she would receive a one-third share of the decedent's estate and prayed it be allowed and paid to her either as a share of the property, or its equivalent in value of $175,585.47.

On November 7, 1958, the executor, William S. Shirk, brother of the appellant and the only son of Gertrude McCourt Shirk, filed his written defense to the appellant's petition, which contained a general denial, and affirmatively alleged the demand was barred by the statute of limitations; was unenforceable by reason of the statute of frauds; was based upon an illegal consideration and void as contrary to public policy, and that the appellant was estopped to assert her demand.

On November 10, 1958, the appellant filed a petition for transfer of her petition for allowance of demand and the executor's written defense to the district court of McPherson County for trial pursuant to G. S. 1957 Supp. 59-2402a. On the same day, the executor waived notice of the hearing and the probate court transferred the proceeding to the district court.

Before reaching the merits, a procedural question which arose in the district court requires attention.

Following transfer of the probate proceeding to the district court, the executor filed a general demurrer to appellant's petition upon the ground that it failed to state facts sufficient to constitute a cause of action against the estate of the decedent. On May 4, 1959, the district court in a written memorandum decision sustained the executor's demurrer holding the alleged oral contract to be void as contrary to public policy and granted the appellant 30 days in which to amend her petition.

On May 27, 1959, the appellant filed an amended petition and the executor again filed a general demurrer upon the same ground, which was likewise sustained by the district court on June 26, 1959, for the same reason.

The appellant has appealed from the orders sustaining the demurrers to both her original and amended petitions, and argues that after a petition for allowance of demand has been filed in

the probate court and a written defense has been filed thereto and the proceeding has been transferred to the district court for trial pursuant to G. S. 1957 Supp. 59-2402a, a demurrer to the petition then pending in the district court is not a proper pleading, and further, that it is improper to demur, in any event, while the written defense is pending and undisposed of.

The contention requires an examination of pertinent sections of the probate code. G. S. 1957 Supp. 59-2402a provides that when a petition shall be filed in the probate court "(3) to allow any claim exceeding $500 in value" any interested party may request the transfer of such matter to the district court. The request may be included in any petition or answer, or may be filed as a separate petition, and shall include an allegation that a bona fide controversy exists and that the transfer is not sought for delay. Notice of the request shall be given as ordered by the probate court.

G. S. 1949, 59-2402b provides that upon the filing of a petition to transfer a probate proceeding to the district court, the probate court shall deliver to the district court the files in the matter or so much thereof as will be necessary for determination of the issues raised, and that,

"Such issues shall thereupon be heard and determined in the district court as on appeal as provided by section 59-2408 of the General Statutes Supplement of 1943 as amended. . . ."

G. S. 1949, 59-2408 prescribes the procedure to be followed in the district court. The section reads, in part:

"Upon the filing of the transcript the district court, without unnecessary delay, shall proceed to hear and determine the appeal, and in doing so *shall have and exercise the same general jurisdiction and power as though the controversy had been commenced by action or proceeding in such court and as though such court would have had original jurisdiction of the matter.* The district court *shall allow* and *may require pleadings to be filed or amended. The right to file new pleadings shall not be abridged or restricted by the pleadings filed,* or by failure to file pleadings, *in the probate court;* nor shall the trial in, or the issues to be considered by, the district court be abridged or restricted by any failure to appear or by the evidence introduced, or the absence or insufficiency thereof, in the probate court. . . ." (Emphasis supplied.)

Much has been written concerning the jurisdiction and procedure of a probate proceeding which has been appealed to the district court, but it would serve little purpose to quote extensively from our many decisions; they may be found in the annotations under pertinent sections of Chapter 59, entitled "Probate Code," General

Statutes of Kansas, 1949. We frankly concede that some of those decisions contain statements and holdings contrary to what is now being said and held, which have resulted in confusion to the Bench and the Bar of the state as to just what is the correct rule of procedure, that is, whether demurrers and other pleadings may be filed in the district court when a probate proceeding has been appealed to that court pursuant to G. S. 1949, 59-2408. Notwithstanding what has been previously said and held in those decisions to which general reference is made, we are of the opinion that the correct and proper construction of pertinent sections of the probate code is that while a probate proceeding is pending in a probate court the only pleadings necessary or proper are a petition and a written defense (G. S. 1949, 59-2237; *In re Estate of Fast,* 170 Kan. 352, 354, 225 P. 2d 1056). But once the proceeding reaches the district court, either by appeal or otherwise (as in this case by transfer), the proper interpretation of G. S. 1949, 59-2408 requires this court to hold that the district court shall have and exercise the same jurisdiction and power as though the controversy had originally been commenced by action or proceeding in that court and the pleadings authorized or required to be filed or amended are the same as those referred to in G. S. 1949, 60-703 of the code of civil procedure, and the right to file new pleadings shall not be abridged or restricted by the pleadings filed, or by the failure to file pleadings, when the proceeding was in the probate court (*Roberts v. Setty,* 154 Kan. 505, 506, 119 P. 2d 539; *Egnatic v. Wollard,* 156 Kan. 843, 849, 857, 137 P. 2d 188; *Burns v. Drake,* 157 Kan. 367, 139 P. 2d 386; *In re Estate of Pallister,* 159 Kan. 7, 15, 152 P. 2d 61; *In re Estate of Welch,* 167 Kan. 97, 204 P. 2d 714; *Pacific Intermountain Express Co. v. Lasswell,* 171 Kan. 108, 229 P. 2d 763; *In re Estate of Michaux,* 171 Kan. 417, 233 P. 2d 510; *In re Estate of Cipra* [38,694], 173 Kan. 334, 246 P. 2d 267; *In re Estate of Forster,* 178 Kan. 120, 123, 283 P. 2d 491).

In view of the conclusion just announced, the executor's demurrer to the appellant's original petition was properly filed in the district court and that court did not err in ruling upon it because, as claimed by the appellant, the executor's written defense was then pending and undisposed of in the district court as a result of the transfer proceedings.

We proceed to the merits and to the appellant's principal contention that the demurrers were erroneously sustained.

The executor asserts that the substance of this appeal necessarily turns upon whether the original petition for allowance of demand alleged a valid claim against the decedent's estate; that if it did not, then the amended petition for allowance of demand had no basis for relating back in time and was clearly barred by the statute of nonclaims (G. S. 1949, 59-2239; *Roberts v. Setty*, supra; *In re Estate of Manweiler*, 185 Kan. 343, 346, 342 P. 2d 730).

The contention requires an examination of the original petition to determine whether it alleged a valid demand against the estate of the decedent. (*Pacific Intermountain Express Co. v. Lasswell*, supra; *Roberts v. Setty*, supra; *In re Estate of Manweiler*, supra.) In so doing, it is neither necessary nor required that we set forth in detail the content of that pleading. Suffice it to say that, after a careful examination of its allegations, when measured by the rule which requires such a pleading to be liberally construed and given the benefit of all favorable inferences to which its allegations are entitled (*In re Estate of Ray*, 180 Kan. 634, 306 P. 2d 190), notwithstanding unfavorable inferences might also be drawn, we have concluded they were sufficient when challenged by the demurrer to allege a valid demand against the estate of the decedent based upon the existence and breach of the oral contract set forth, and tolled the statute (G. S. 1949, 59-2239) fixing the time within which a demand against a decedent's estate must be exhibited in the probate court. That being the case, the appellant was entitled to amend her petition in the district court, and, having done so, the amended petition related back to the date of the original pleading since its allegations arose out of the conduct, transaction and occurrences set forth in the original pleading.

Pertinent allegations of the amended petition setting forth the nature of the claim and the relief sought are summarized and quoted:

The appellant's mother, Gertrude McCourt Shirk, was married three times. During her first marriage a daughter was born who died at the age of two years as a result of an accident sustained while Mrs. Shirk was away from the child and in Texas. Mrs. Shirk was divorced from her first husband. During her second marriage two children were born, William S. Shirk, the executor, and Betty Shirk O'Brien, the appellant. Her second husband died, and her third marriage ended in divorce. No children were born of that marriage.

By the fall of 1939 William Shirk had been married and divorced twice; no children were born of either marriage.

In 1934 the appellant married Leland Quantius at Salina, Kansas, and one child, Carmen, was born on October 1, 1937. That marriage terminated in divorce on April 1, 1939, at Kansas City, Kansas, and the appellant was awarded the care and custody of Carmen.

Following her divorce, the appellant moved to Topeka, but had difficulty supporting Carmen and herself and it was necessary that she be away from Carmen from time to time. Mrs. Shirk was displeased with the conduct and the marital failures of her two children, and thought that her only grandchild was receiving inadequate care. During the fall of 1939 she took Carmen from appellant's home in Topeka to her residence in McPherson. Mrs. Shirk then decided to adopt and rear Carmen as her own child so that she would be assured of posterity, and so that Carmen would not come to the untimely death as did her first child. Mrs. Shirk believed the welfare of the child required her to care for Carmen until appellant should remarry and establish a home for the child, and that she could best care for her only granddaughter by adopting Carmen as her own daughter.

Paragraph 10 alleged:

"Gertrude McCourt Shirk then orally proposed to your petitioner that if Betty Shirk would give her consent to the adoption of Carmen Quantius by Gertrude McCourt Shirk, that Gertrude McCourt Shirk would take good care of and rear Carmen Quantius, make Carmen Quantius her heir along with William Shirk and Betty Shirk, and that the three would share equally in her estate. Gertrude McCourt Shirk was deeply concerned in the health and welfare of her only grandchild and was afraid that if this grandchild died she would probably have no descendants after the death of her two children. Gertrude McCourt Shirk further stated that if thereafter Betty Shirk should be happily married and have a good home for Carmen Quantius, and if she and her husband should then desire to adopt Carmen Quantius, Gertrude McCourt Shirk would then give her consent to such readoption. Your petitioner believed that such an arrangement would be for the best interests and welfare of Carmen Quantius and she then accepted said proposal and agreed to do as her mother requested. The provision in said agreement that your petitioner would not be denied her one-third share as a daughter in the Gertrude McCourt Shirk estate was incidental to the main purpose of such agreement which was to provide for and secure the welfare of Carmen Quantius."

Paragraph 13 reads:

"Soon after making such agreement, and after Betty Shirk had lived for a while in the Town House with Carmen Quantius and her mother, Gertrude

McCourt Shirk told Betty Shirk that she didn't want her living in McPherson and that she wanted her to leave McPherson, Kansas and establish a home for herself elsewhere. Betty Shirk then asked Gertrude McCourt Shirk how such would affect her share in the estate of Gertrude McCourt Shirk and Gertrude McCourt Shirk then promised that if she would go immediately she would get her third share in her estate. Your petitioner then agreed to do as her mother requested."

McPherson was the appellant's home town where she had been reared and she desired to make it her permanent home. By going elsewhere to live she was confronted with the problem of establishing a new home and making new friends. Nevertheless, the appellant complied with Mrs. Shirk's request and immediately went to San Antonio, Texas, where she established her home. In so doing, she lost the daily companionship of her daughter, the privilege of watching her grow and develop, and the love and affection of the child for her was lessened.

Some months later the appellant gave her written consent to the adoption of Carmen by Mrs. Shirk, which proceeding was pending in the probate court of McPherson County. At about that same time, the father of Carmen also gave his written consent to the adoption. When the adoption was completed in January, 1941, Mrs. Shirk informed the judge of the probate court that she intended to consent to the readoption of Carmen by the appellant if she remarried and could furnish Carmen with a good, happy home.

On August 15, 1941, the appellant married Walter E. O'Brien at San Antonio, Texas. They were happily married, and on September 2, 1942, sought the readoption of Carmen, and received Mrs. Shirk's written consent that same day.

On November 18, 1942, an order was entered by the probate court of McPherson County whereby the appellant and her husband jointly readopted Carmen, which order was made final on June 14, 1943. At that time Carmen was just past five and one-half years of age.

Mrs. Shirk died testate on December 10, 1956, leaving an estate of $536,756.42, and left as her sole heirs at law the appellant and William S. Shirk. Mrs. Shirk's will deprived the appellant of all her interest in the decedent's estate except a $100 monthly payment for so long as William S. Shirk should occupy one of the decedent's homes, rent free.

Carmen Quantius (now Warren) is of legal age and is married and has a child of her own. She employed counsel who advised her with

reference to Mrs. Shirk's estate. Carmen received substantial gifts from Mrs. Shirk during her lifetime and was made joint owner in a substantial amount of stocks and bonds and was given a tenth share of the residue of her estate. Provisions in Mrs. Shirk's will nullified all legacies and bequests to any person contesting her will, and since Carmen had received substantial amounts of property, it was inadvisable for her to bring or join in any action based on the above mentioned contract for her benefit.

The prayer of the amended petition was that one-third part of the decedent's estate be paid to the appellant either as a share of the property or its equivalent in value.

We turn to the merits of this appeal. The appellant mother contends the trial court erred in sustaining the demurrer to the amended petition and asserts that the motivating or primary purpose of the contract between the grandmother and herself was centered around the child with each doing what appeared to be for her advantage and welfare; that under the circumstances, her acceptance of the grandmother's promises was incidental to the principal purpose of the contract and was not illegal; that while many benefits were gained for the child, she gained nothing for herself except the grandmother's promise to not disinherit her, and that the enforcement of the contract is not against good morals or public policy.

The executor principally argues that the contract is void as being in violation of public policy because it is based upon an illegal consideration, namely, an agreement by a mother to barter her rights in her child for one-third of her mother's estate. He also contends that since the contract was not in writing it violates the statute of frauds (G. S. 1949, 33-106).

As preliminary to discussing the contentions of the parties, we refer to the rule which is axiomatic that the court is bound for the purpose of demurrer to accept and treat as true all allegations which tend to establish the validity of the contract, and every reasonable inference must be indulged in favor of the mother's claim, and those which tend to render it invalid must be rejected. In other words, if two inferences may be drawn from the circumstances alleged, that which is favorable must be accepted and that which is unfavorable rejected. Thus, if it may be reasonably inferred from the circumstances that the contract claimed by the mother to have been made was valid and enforceable, as against the claim that it was void in violation of public policy, the inference in favor

of the former must be drawn (*Craft v. Bent,* 8 Kan. 328, 332; *Geier v. Eagle-Cherokee Coal Mining Co.,* 181 Kan. 567, 573, 313 P. 2d 731).

The factual situation set forth in the amended petition is most unusual, and the legal questions presented are not altogether free from difficulty. We have been unable, after the most diligent search, to find a case where a contract involves a similar factual situation as the one now before us. Be that as it may, our attention is first directed to the question whether the contract was supported by sufficient consideration.

The grandmother dictated the events which brought the contract into being. In so doing, she received benefits which she would not have otherwise enjoyed. By the adoption, she received the affection and companionship of the child for approximately three years. While she could have made the child beneficiary of one-third of her estate without the contract since the child was a natural object of her bounty, that clearly was not the motivating force of her proposal. Her concern was the welfare of the child. She wanted and obtained the legal right to Carmen so she could give her the care and attention a child of tender years requires and she particularly desired to make certain the child did not succumb to illness or accident which caused the untimely death of her first child, thus assuring herself of posterity and living descendents. By securing the mother's promise to leave McPherson and live elsewhere, which the mother did, the grandmother was permitted to have the sole rearing of Carmen and to care for her unfettered by the presence of the mother. But that was not all. The adoption proceedings had the effect of "quieting title" so to speak, of the Shirk family's parental rights in the child since in addition to the mother's consent, the father's consent was also obtained. Thus, the grandmother in gratification of her own pride and ambition secured sole parental rights with no fear that the father might in the future be granted the care and custody of the child to the exclusion of the mother, and, in all probability, deprive the grandmother of any right to direct the rearing and education of her only grandchild.

Clearly, in complying with the grandmother's proposal and promises the mother suffered detriments. She temporarily lost the control, custody and daily companionship of her daughter. She lost the privilege of watching her grow and develop and the love and affection of the child for her was lessened. In addition, she gave up

her right to continue to live in McPherson. In reliance upon the reiterated promise that she would get her one-third share, the mother moved to San Antonio, Texas, and established a home. The mother's agreement to change her residence was a legal consideration to support the grandmother's promise to give the mother a one-third share of her estate (*Greiner v. Greiner*, 131 Kan. 760, 765, 293 P. 759; *Zachos v. C. & S. National Bank*, 213 Ga. 619, 624, 100 S. E. 2d 418; Restatement of the Law, Contracts, § 90, p. 110). See, also, *Burgesser v. Wendel*, 73 N. J. L. 286, 62 A. 994, where it was held:

"A change of residence at another's request is a valid consideration for a promise to pay money."

and see 17 C. J. S., Contracts, § 88, p. 436, and 12 Am. Jur., Contracts, § 80, pp. 574, 575. Insofar as *Foster v. Foster*, 129 Kan. 132, 281 P. 902 conflicts with the views expressed in this opinion, that decision is disapproved.

The contract was fully performed by the mother and, for that matter, was partially performed by the grandmother since she gave her consent to the readoption. The grandmother got all she bargained for. Generally speaking, consideration is not insufficient merely because it is inadequate. To be sufficient, the consideration agreed upon must be a legal benefit or detriment, and need not be a thing of pecuniary value or reducible to such value (12 Am. Jur., Contracts, § 122, pp. 614, 615; 17 C. J. S., Contracts § 88, p. 435). Nor does the legal sufficiency of a consideration for a promise depend upon the comparative economic value of the consideration and of what is promised in return, for the parties are deemed to be the best judges of the bargains entered into. The value of all things contracted for is measured by the appetite of the contractor (12 Am. Jur., Contracts, § 122, pp. 614, 615). Where a party contracts for the performance of an act which will afford him pleasure, gratify his ambition, please his fancy, or express his appreciation of a service another has rendered him, his estimate of value must be left undisturbed, unless there is evidence of fraud (12 Am. Jur., Contracts, § 122, p. 615). In the class of cases mentioned, if there is any legal consideration for a promise, it is sufficient. If this were not the case, the result would be that the courts would be substituting their own judgment for the promisor's, and in so doing, make a new contract for the parties (12 Am. Jur., Contracts, § 122, pp. 615,

616; 17 C. J. S., Contracts, § 88, p. 436). In *State Investment Co. v. Cimarron Insurance Co.*, 183 Kan. 190, 326 P. 2d 299, this court last considered the sufficiency of consideration to support a promise, and said:

"In *Farmers Equity Coop. Ass'n v. Tice*, 122 Kan. 127, 251 Pac. 421, we held that any benefit, profit or advantage flowing to the promisor which he would not have received but for the contract, or any loss or detriment to the promisee is sufficient consideration to support the promise. (*Coder v. Smith*, 156 Kan. 512, 134 P. 2d 408; *French v. French*, 161 Kan. 327, 167 P. 2d 305.)" (l. c. 195.)

In view of the foregoing, the oral contract alleged in the original as well as the amended petition for allowance of demand was based upon a sufficient consideration and the mother may enforce her rights thereunder, unless the contract violates public policy.

In support of his contention that the contract is void as being contrary to public policy, the executor cites and relies upon *Savannah Bank & Trust Co. v. Hanley*, 208 Ga. 34, 65 S. E. 2d 26, which held that where a mother surrenders possession of her infant daughter to a third person for the purpose of having the child adopted by him in consideration of an alleged promise by his wife to leave to the mother and the brothers and sisters of the adopted child her entire estate by will, was void as against public policy. In the course of that opinion the case of *Savannah Bank & Trust Company v. Wolff*, 191 Ga. 111, 11 S. E. 2d 766, was cited, which held that where the mother of an infant daughter agrees to surrender and does actually surrender the child to a third person for the purpose of having the child adopted by him, and the third person in turn agrees to adopt, care for and rear the child, and leave to the adopted child one-half of his estate by will, a contract arises which is mutually binding and enforceable on both sides. As will be noted, the contract in the Hanley case, *supra*, differs from the contract involved in the Wolff case, *supra*, in that in the former the agreement was to leave the property to the mother and brothers and sisters of the adopted child, whereas in the latter the agreement was to leave it only to the adopted child. See, also, *Hendrix v. Hunter*, 99 Ga. App. 785, 110 S. E. 2d 35.

The Wolff case, *supra*, accords with the holdings of this court to the effect that a child is entitled to have an established contract for an adoption and the rights of the child enforced against the estate of the foster parent. Its enforcement has no element of

immorality or illegality and is not violative of public policy (*Anderson v. Anderson*, 75 Kan. 117, 88 P. 743; *Malaney v. Cameron*, 98 Kan. 620, 159 P. 19, rehearings denied 99 Kan. 70, 161 P. 1180, 99 Kan. 424, 161 P. 1180, 99 Kan. 677, 162 P. 1172; *Hickox v. Johnston*, 113 Kan. 99, 213 P. 1060, 27 A. L. R. 1322; *Snuffer v. Westbrook*, 134 Kan. 793, 795, 8 P. 2d 950). See 57 Am. Jur., Wills, §§ 195, 198, pp. 173, 175; 1 Am. Jur., Adoption of Children, §§ 19, 20, 21, pp. 631, 632; 2 C. J. S., Adoption of Children, § 27 (2) (a), pp. 399, 400; 94 C. J. S., Wills, § 113 (1), p. 866; *Phillips v. Frederick*, 257 Ala. 283, 58 So. 2d 584; *Healey v. Simpson*, 113 Mo. 340, 20 S. W. 881, and *O'Brien v. Wallace*, 137 Colo. 253, 324 P. 2d 1028. See, also, Anno: 15 A. L. R. 223, 27 A. L. R. 1325, 69 A. L. R. 51, 52, 106 A. L. R. 748 and 142 A. L. R. 84.

Contrary to the assertion of the executor, the contract here, as distinguished from the one involved in the Hanley case, *supra* obligated the grandmother to leave property not only to the mother but to the *adopted child* as well. Under our decisions, the contract did not undertake to place Carmen in any other relation to the foster parent—the grandmother, than an heir with equal right to inherit along with the mother and William Shirk one-third of the grandmother's estate, and was unquestionably enforceable with respect to her rights thereunder (*Malaney v. Cameron*, supra; *Hickox v. Johnston*, supra; *Snuffer v. Westbrook*, supra).

Consequently, this controversy resolves itself down to the question whether the contract with respect to the mother's rights violated public policy. It is fundamental that parents may not barter or sell their children nor may they demand pecuniary gain as the price of consent to adoptions. This is so inherent in the fabric of American law that citation of authority is unnecessary. In 39 Am. Jur., Parent and Child, § 30, pp. 621, 622, the rule is stated:

"A transaction which in substance amounts to a sale of a child is, of course, contrary to public policy. In a number of jurisdictions, however, the courts have held that a contract, whether an adoption contract or merely an agreement for the transfer of the custody of the child, is not brought within this rule *merely because it provides for the surrender by a parent of his child to another in consideration of the latter's promise to give or leave money or property to the parent or to the child, where it appears that the contract is in fact one which is promotive of the welfare and best interests of the child, and especially where the parent is not in a position to furnish proper care for the child and the promisor is able and fit to perform the obligation. . . ."* (Emphasis supplied.)

We think the cases of *Enders, Appellant, v. Enders et al., Exrs.,* 164 Pa. 266, 30 A. 129, 27 L. R. A. 56, 44 Am. St. Rep., 598, and *Clark v. Clark,* 122 Md. 144, 89 A. 405, 49 L. R. A. (NS) 1163 are analogous. While neither involved a severance of parental relation, each involved a family agreement by which a grandfather of substantial means proposed to his daughter-in-law, who was without means and living apart from her husband, that he be permitted to take the child into his home and care for, rear and educate it with the promise to the mother in the Enders case to pay $20,000 to her and $10,000 to the child when it became of age, and in the Clark case to make weekly payments to the mother for her support and maintenance for life. In each case, because the contract was for the best interests of the child, it was held not to violate public policy and was enforceable on the part of the mother.

· On the other hand, a contract of a parent by which he bargains away for his pecuniary gain the custody of his child to a stranger and attempts to relieve himself from all parental obligation, placing the burden on another who assumes it, without natural affection or moral obligation, but only because of the bargain, is void as against public policy. Such a contract would be the mere sale of the child for money. But the instant case involves a family compact. The proposal for adoption upon which the contract was based came from the grandmother. It was not prompted by self-seeking on the part of the mother. Implicit in it is the favorable inference that the controlling consideration was the welfare of the two-year-old child. That fact permeates all the circumstances alleged. While the mother received the promise of the grandmother that she would receive one-third of her estate we cannot say that, under all the circumstances alleged and the favorable inferences to which they are entitled, the mother's consent to the adoption falls within the rule that a parent may not transfer his parental rights and duties to another in an attempt to sell or barter his child for his own financial gain.

In the first place, the mother could not do for the child what she would like to have done. She was having difficulty in supporting herself and the child and was required to be away from time to time. As a result, the welfare of the helpless child was in peril. The grandmother, conscious of this and being of ample fortune and believing that her only grandchild was receiving inadequate care, came to Topeka and took the child to her home in McPherson.

She wanted to be personally assured the child would receive the best care possible. Her pride centered around the child as her only hope of posterity. It was there the grandmother proposed the adoption. The mother, cognizant of the welfare of the child, agreed. The effect of the contract was to permit the grandmother to take the child, care for and support it as her own daughter for a limited period—until the mother remarried and established a happy home at which time she could reclaim its custody by readoption. Both parties desired to give the child the best home possible and they realized that the child would be better cared for with the grandmother until such time as the mother could provide such a home. What was done for Carmen was highly commendable and her interests were best served by the family agreement.

Unlike the case of *Savannah Bank & Trust Co. v. Hanley*, supra, the contract here involves a mother who was a daughter and heir at law of the adopter; it brought about the agreement that Carmen would receive one-third of the estate but also provided that the mother would receive the same share. That agreement did not undertake to place Carmen in any other relation to the grandmother as foster parent than as an heir with an equal right to inherit along with the mother and William Shirk. Any benefits the mother was to receive under the contract were secondary and incidental to its principal purpose since the share promised her was just what the law would have given her had the grandmother then died intestate, and what, in all probability, she would sometime receive unless the grandmother, in violation of the contract, disinherited her or diminished by will the share which would have come to her in case of the grandmother's intestacy (*Stahl v. Stevenson*, 102 Kan. 447, 171 P. 1164).

When the contract was completed with respect to the adoption, the status of the Shirk family was changed; the grandmother had three children who would inherit her estate under the law of intestate succession instead of two. That children should receive a share of their parents' estate is favored in the law. But, in the absence of an agreement not to disinherit a child, a parent may dispose of his property by will or otherwise to others than his child or children. In this case, all the grandmother did insofar as the mother was concerned was to agree she would receive her one-third share of the estate. That is to say, the grandmother agreed she would not disinherit the mother. A contract not to disinherit

has been held by this court to be valid and enforceable (*Stahl v. Stevenson,* supra; *Smith v. Nyburg,* 136 Kan. 572, 16 P. 2d 493), The grandmother's promise was not to give the mother any part of the property which she then possessed, but to see that at her death the mother would receive one-third of her estate which might be of equal or greater value, but which also might be very much less. Had the mother gained something in addition to the share to which she was entitled as a daughter, then the executor's conclusion that "the child was a means to securing a desired end" might be proper. But, the mother gained nothing more than that which she was morally and legally entitled. Actually, by consenting to the adoption she reduced her share as a daughter and heir at law from one-half to one-third.

In order to hold the grandmother's promise that her three heirs share equally in her estate as being contrary to public policy, we must ascribe the basest of motives and the most evil of intentions to the mother. To do so would do violence to the rule that every reasonable inference must be indulged in favor of the mother's claim.

Public policy forbids enforcement of an illegal or immoral contract, but it equally insists that those contracts which are lawful and which contravene none of its rules shall be enforced, and that they shall not be set aside or held to be invalid on a suspicion of illegality. A contract is not void as against public policy unless injurious to the interests of the public or contravenes some established interest of society (17 C. J. S., Contracts, § 211d, p. 570). Illegality from the standpoint of public policy depends upon the facts and circumstances of a particular case (*Stewart v. Fourth Nat'l Bank,* 141 Kan. 175, 39 P. 2d 918), and it is the duty of courts to sustain the legality of contracts where possible (*Foltz v. Struxness,* 168 Kan. 714, 215 P. 2d 133). There is no presumption that a contract is illegal, and the burden of showing the wrong is upon him who seeks to deny his obligation thereunder. The presumption is in favor of innocence and the taint of wrong is a matter of defense (*Mosher v. Kansas Coop Wheat Mkt. Ass'n,* 136 Kan. 269, 15 P. 2d 421; *Okerberg v. Crable,* 185 Kan. 211, 341 P. 2d 966).

We see nothing in the contract as alleged which renders it illegal or void or as against public policy, or which tends to show that the consideration was insufficient. If there be any doubt on these

points, the subsequent agreement of the mother to leave Mc-Pherson and go elsewhere to live at the insistence of the grandmother would be sufficient to tip the scales of justice in favor of holding that the amended petition alleged a valid claim against the decedent's estate.

Contrary to the contention of the executor, the contract alleged by the mother was not within the statute of frauds (*Smith v. Nyburg*, supra, and cases cited therein). Moreover, full performance as alleged by the mother would relieve the cause of action from the inhibitions of the statute of frauds (*Meador v. Manlove*, 97 Kan. 706, 156 P. 731).

This opinion deals with the ruling on a demurrer to an amended petition. As heretofore indicated, all reasonable inferences in favor of the amended petition are required to be drawn, but in drawing those inferences we do not wish to be understood as passing upon them as true. The allegations of that pleading remain susceptible to proof by substantial competent evidence. With that observation, we conclude the order sustaining the demurrer to the amended petition was erroneous. The trial court's order is reversed with directions to proceed in accordance with the views expressed herein.

It is so ordered.