WALKER *v.* WILLIAMS, et ux.

Apr. 14, 1952.

No. 38360 (58 So. (2d) 79)

Fulton Thompson, for appellant.

38

Will **S. Wells,** for appellee.

**McGehee, C. J.**

In this habeas corpus proceeding the petitioner, Annie Ruth Walker, seeks to obtain from Fannie B. Williams and her husband, Isaiah Williams, the legal custody of petitioner's illegitimate son who was more than three years of age at the time of the filing of the petition, he having been born on March 31, 1948, at Jackson, Mississippi, in the home of the appellee-defendants, Fannie and Isaiah Williams, where he has remained since birth. The trial judge denied the relief and dismissed the petition. At the hearing, he made no finding of fact as to the particular ground upon which he based the decision appealed from, and we must therefore assume in support of the judgment rendered that he found on disputed issues of fact in favor of the defendants.

The defendants predicate their legal right to retain the custody of the child mainly upon the fact of its alleged abandonment by its mother at or about the time of its birth, and for a long period thereafter, under the following state of facts and circumstances, to wit:

The petitioner, who was twenty-three years of age and unmarried at the time she became pregnant with this

child, claims to have been seduced and betrayed by a Negro named Melvin Mellett under a promise of marriage, who broke his promise to her and left Jackson and took up his abode elsewhere after she became pregnant in July 1947. She had also met Tillman Walker while she was teaching school at Inverness, Mississippi, where he then resided. She later returned to Jackson, where Tillman Walker became a patient at the U. S. Veterans Hospital and he began to get passes out of the hospital for visits to her during the week-ends in August of 1947, and finally was seeing her at least once a week during October, November, and December of that year, and through January 1948, until they were married on February 5, 1948. At the time of her marriage to Tillman Walker, she claims that he did not know of her condition, although she had then been pregnant for a period of about seven months, and he had been seeing her at least once a week for quite a while prior to their marriage. At any rate, on the next day after their marriage, which they had agreed to keep secret, he returned to Inverness and did not see her again, although she remained in Jackson, until some time after the child in question was born, when they then began living together while he was a student at Jackson College.

It appears from the testimony on behalf of the defendants that in January 1948 before the mother of the child married Tillman Walker on February 5, 1948, he contacted one Annie Lowrey, now Annie Davis, a midwife, and endeavored to persuade her, for the price of $50, to help destroy the child before it was born and was advised by the midwife that the latter would not agree to help her out in this undertaking, but it was suggested by the midwife that she knew of a couple (meaning Fannie and Isaiah Williams) who wanted a child and that Fannie Williams would likely agree for her to give birth to the child in their home if the mother would agree to let her have the child; that the petitioner and the midwife contacted Fannie Williams in that behalf and ascertained

that while she and her husband wanted a child they did not want an infant but wanted a child two, three, or four years of age; that she then proposed to Fannie Williams in the presence of the midwife that they both help her to destroy the child and stated that otherwise she would destroy it after it was born; and that thereupon Fannie Williams undertook to arrange for her to get a room at the home of one Lizzie Daniels, and upon finding that the room would be $5 per week and that the prospective mother was unable to pay this amount, Fannie Williams advised Lizzie Daniels to go ahead and rent her room to someone else, since she was unwilling to pay the rent for an indefinite period.

It was further shown that thereafter Fannie Williams undertook to persuade the petitioner to go to a hospital in Jackson to have the baby but the latter did not want her condition to become known and therefore declined to enter the hospital; that the petitioner stated that she had taken everything that she knew to take to try to get rid of the child and had failed; that a blood vessel in the eye of the petitioner had become ruptured, and whereupon Fannie Williams got someone to take her to a hospital in Yazoo City for immediate treatment, gave her $20 to help out with the expenses, and caused the petitioner to be left at the hospital on the promise that if she would remain there for the birth of the child Fannie Williams would stop by and get the baby when the mother was ready to leave the hospital; that after remaining there for about three days and learning that there were persons there who knew her, the petitioner left the hospital and returned to Jackson; and that on Feb. 6, 1948—the next day after her marriage to Tillman Walker—she went back to the home of Fannie Williams and had an agreement that she should give birth to the baby there in her home.

The petitioner denied having made any request of either the midwife or Fannie Williams that they help her to destroy the child before it was born, or that she threatened in advance to kill it after it was born if they refused

to help her. Therefore this issue of fact was for the determination of the trial judge on the conflicting testimony at the hearing on the habeas corpus proceeding. At any rate, she remained in the home of Fannie and Isaiah Williams from February 6, 1948, until April 5 or 6, 1948, and left the child there, expressly declining to take it with her, after being urged to do so, according to the testimony on behalf of the defendants; but according to the testimony of the petitioner, she left the child there pursuant to an agreement had with Fannie Williams before its birth, that is to say, Fannie and her husband were to be allowed to keep the child in consideration of their having allowed its mother to remain in their home until it was born.

Of course, under the leading case of Hibbette v. Baines, 78 Miss. 695, 29 So. 80, 51 L.R.A. 839, and the case of Bullard v. Welch, 171 Miss. 833, 158 So. 791, 792, and other cases decided by this Court and many other courts, ██ a parent of a child can not irrevocably surrender the right to its custody by a contract in that behalf, even if the same had been made at a time when the parent was not in great distress and was a free agent, such a contract being void as against public policy.

The proposition is too well-settled to require the citation of authorities, other than the case of Hibbette v. Baines, supra, that ██ it is presumed to be to the best interest of a child for its parent to have its care and custody unless the parent is shown to be an unsuitable person to have the care and custody or has abandoned the child. The primary question in the instant case is whether or not the facts are such as to show an abandonment in a legal sense. We have therefore thought it proper and necessary in this case to set forth the facts somewhat in detail.

In further reference to the alleged abandonment of the child by its mother, it was shown on behalf of the defendants that on Saturday afternoon, following the birth of the child on Wednesday, the doctor returned to the home

of the defendants, and in the presence of the midwife, obtained the information from the petitioner herein as to how the birth certificate should be filled out and filed with the Bureau of Vital Statistics; that the information furnished the doctor by the petitioner was that the father of the child was Isaiah Williams and that the maiden name of the mother was Fannie B. Coleman (now Fannie B. Williams); that the said Fannie Williams was not then in the bedroom where the information was furnished, but returned to the room, and at the request of the real mother of the child, wrote at the bottom of the certificate "O. K. Fannie B. Williams"; that the doctor had not formerly known any of the parties but of course knew that he had attended the woman who was in the bed and who was giving him the information for the birth certificate; and it appears that the birth certificate, as thus filled out, giving the child's name as Gerald David Williams, was filed as a public record in the office of the Bureau of Vital Statistics at Jackson, Mississippi.

Assuming that it was the mother and petitioner who furnished the doctor the wrong information as to who the parents of the child were, since the trial judge had a right to so find from the testimony of the midwife and Fannie Williams, then this action on her part was a strong circumstance to indicate that she did not intend to have her identity as the mother of this child to become known in the future, and that she had determined to completely abandon its care and custody to the defendants, with the intention to shirk or evade the duty and the trouble or expenses of rearing it. As against this circumstance, the trial judge had before him the testimony of the petitioner, whereby she denied having had anything to do with furnishing the information for the filling out of the birth certificate, and also her testimony that she left the child at the home of the defendants in keeping with her solemn agreement with them in that behalf.

Moreover, it was further shown on behalf of the defendants that the petitioner would not nurse the child,

refused to have anything to do with it, stated that she did not want it, would not have it, and did not return to the home of the defendants to see the child until about one year and two months after its birth and again when it was about two years of age, but made a third and last visit there to see if they would return the child to her about ten days before she filed her petition for the writ of habeas corpus on May 11, 1951; that during all of this time she did not contribute anything whatsoever to the support of the child, although she was earning from $18 to $20 per week as a beautician, in addition to what her husband was earning as an interior decorator, plus his disability benefits and on-the-job training compensation from the Federal Government; and that the petitioner did not throughout this period ever buy the child any clothing, a Christmas or birthday present, or anything else. In contradiction of this testimony as given by both of the defendants as to the failure of the petitioner to contribute anything to the support of the child, she testified that she visited the home of the defendants eight or ten times a year and always carried it $5 or $6 on each visit.

In further support of the theory of abandonment relied on by the defendants, it was shown by the testimony of the petitioner on cross-examination that her husband found out about the identity of this child in the early part of the year 1949, and we now quote from her testimony, the following:

"Q. He found out about this baby in the early part of 1949? A. Yes, sir.

"Q. When he found out about the child, what was his attitude and yours about getting the child? A. He told me, he said, 'I love you and we have one baby and I want these two to be together and I will take it and treat it like mine.'

"Q. That was the early part of 1949? A. Yes, sir.

"Q. Why haven't you, since the early part of 1949 and until 1951, two years later, tried to do anything to get

your child? A. I had worried over it and I had promised to give her (Fannie Williams) the baby and I didn't want to (rue) back * * * ".

In other words, according to the petitioner's own testimony, the trial judge was warranted in finding that she did not want the child after it was about a year old, even though her husband had expressed a willingness and a desire to take over its care and custody. The trial judge evidently did not believe her statement that her failure to try to get the child was due altogether to her sense of regard for the alleged agreement that she had with the defendants prior to its birth. She contended that at the time she made the alleged agreement she was in great distress and desperate as to what to do to protect her name, and that she should not therefore be held accountable on her promise to the defendants to let them keep the baby, and be now held to have abandoned it. Naturally, she was distraught and had to find a place to give birth to her baby and did not therefore feel bound by an agreement made under such circumstances, but nevertheless she claims that on account thereof she felt that she should not have asked for the custody of the child a year later when her husband expressed his willingness and desire that she seek its custody.

Whatever may have been the state of mind of the distraught mother, immediately prior to and following the birth of the child, her problem had been solved after the child was born in a good home where the occupants had agreed to care and provide for it in view of her unwillingness to take it with her upon leaving the home. The trial judge was fully warranted in believing that she did not want the child and was unwilling to take over its care and custody a year later when her husband expressed his willingness and desire that she do so. Certainly her abandonment of the child was complete when she failed to avail herself of the opportunity offered her by her husband.

We recognize the rule announced in Hibbette v. Baines,

supra, to the effect that ▮▮ it is absolutely necessary that the evidence shall show clearly an abandonment by the parent before there can be in law a forfeiture of the natural and legal right to its custody by a parent who is a suitable person to have its care and custody. But we are of the opinion that the facts and circumstances of this case are sufficient to show an abandonment. In Hibbette v. Baines [78 Miss. 695, 29 So. 81], it was recognized that a parent however moral may abandon a child by ''contributing nothing to its support, taking no interest in it, and permitting it to remain continuously in the custody of others, substituting such others in his own place so that they stand *in loco parentis* to the child, and continuing this condition of affairs for so long a time that the affections of the child and of the foster parents have become mutually engaged to the extent that a severance of this relationship would surely result in destroying the best interest of the child.''

In the case of McAdams v. McFerron, 180 Miss. 644, 178 So. 333, which was cited in the later case of Ainsworth v. Boykin, 198 Miss. 756, 23 So. (2d) 297, the test stated and adopted by the Court on what constitutes an abandonment is in these words: ''Appellant, as well as appellees, relies on section 216 of Amis on Divorce and Separation in Mississippi, which we think correctly states the governing principles of law. That section is in this language: 'A careful study of the reported cases shows that ▮▮ where a parent, without just cause or excuse forsakes or deserts his or her infant child, for such a length of time, and under such circumstances, as to show an intent to shirk or evade the duty, trouble or expense of rearing it, or a callous indifference to its wants, or a reckless disregard of its welfare, he or she is guilty of such an abandonment of it as to bar his or her right to thereafter reclaim its custody from any person who may have ministered to and protected it during such period of desertion. McShan v. McShan, 56 Miss. 413; Fullilove v. Banks, 62 Miss. 11; Morgan v. Shelly, 111 Miss. 868, 72 So.

700. Such conduct conclusively rebuts and overthrows the legal presumption that the welfare of the child would, other things being equal, be best served by the custody and control of the parent.' " [180 Miss. 644, 178 So. 335.]

Even though a few other courts have adopted as a definition of an abandonment the placing of a child on a doorstep or abandoning it entirely to chance, and have held that the making of arrangements beforehand for a proper person to have custody of the child is not an abandonment, such as would deprive a parent of its custody, we are of the opinion that the rule announced in our own decisions is not so strictly limited. This statement as to what it takes to constitute an abandonment of a child is found in 10 C. J. S., Bastards, Sec. 17, in a paragraph of the text beginning on page 82 and ending on page 83 thereof, and the only case cited to support the theory that it is necessary for a child to be placed on some doorstep or left in some convenient place in the hope that someone will find it and take charge of it, or that its fate must be left entirely to chance, in order to constitute an abandonment, is the case of Jenson v. Earley, 63 Utah 604, 228 P. 217, and we have found three New York cases and one from North Carolina which hold that an abandonment connotes such action. In the instant case, the trial judge was warranted from the evidence in finding, if he had seen fit to do so expressly, that this mother would have been willing to have left this child anywhere, and under conditions altogether unfavorable to its welfare, in order to carry out her determined purpose to conceal her identity as its mother, and to shirk or evade the duty and the trouble or expenses of rearing it. This record is barren of any proof or indication that she ever manifested any affection for the child at any time after its birth, but on the other hand it is abundantly shown by the testimony on behalf of the defendants that she did not want the child at all until shortly before the filing of this petition for habeas corpus after it was about three

48

years of age. Her friends and neighbors who testified as witnesses on her behalf did not know until shortly prior to the trial of the case that she had such a child, and it was evidently her purpose until shortly before the filing of the proceeding that they should never know of its existence. Her own father testified that he did not know that such a child had been born until this proceeding was instituted.

While it seems to be recognized in other jurisdictions that the mother of an illegitimate child is primarily entitled to its custody, control and services on the same theory that any other parent is entitled thereto, the fact remains that if the court is to consider the best interests of a child, there should be taken into consideration that the attitude of the mother of such a child is vastly different from the attitude and affection usually entertained by any other mother. Other mothers, that is to say, those whose children are begotten and born in lawful wedlock, have rarely, if ever at all, left their infants on doorsteps or trusted their destiny to the vicissitudes of fortune or their fate to the mere chance of their coming into good hands alive. As to the children of these, ''before their tiny hands can lift a feather's weight they have drawn two hearts closer together and their innocent prattle echoes through two lives,'' and before they can lisp a single word, one parent has experienced the sweet consciousness of motherhood and the other has been given the added strength that comes with a sense of responsibilty. As to the child in question, such cannot be said as to the experience of either the mother or the putative father, Melvin Mellett, or the man Earl Anderson who is alleged to have first called the midwife to induce her to bring about an abortion for a price stated, since he could not marry the wronged woman because of the fact that he was already married. In any event the courts should not by judicial precedent make it too easy for the mother of an illegitimate child, who is in the custody of others in the same city, and who has been in their custody for a

long period of time, though in a distant part thereof from her home, and who has shown no affection or has given any care or consideration for it; or for such a mother who may live in another town or city, to come into a local court and expose the fact of the illegitimacy of a child among its friends and acquaintances and those of the foster parents to seek its custody by habeas corpus. Proper care and regard for the welfare and best interest of such a child should have prompted its mother to refrain from any unnecessary disclosure of any fact that would unjustly injure its standing in the community where it resides in a good home, and where it is being well reared and provided for. The trial judge doubtless thought that the foster parents had shown a greater interest in the child's welfare in that regard by their silence as to its true status, prior to the disclosure thereof by the mother, than she has shown by such disclosure.

We have carefully examined our own decisions, and those of other jurisdictions cited in the briefs of counsel, and have reached the conclusion that the rule announced in the case of McAdams v. McFerron, supra, hereinbefore quoted, is applicable in favor of the defendants in the case at bar, and that the finding of the trial judge can not be said to be mainifestly wrong, even though the proof introduced by the petitioner shows that she is now of good moral character and is married to a man of good reputation, and that they are law-abiding citizens and church-going people, who rent a two-bedroom apartment in a community among respectable colored people, and are financially able to support and maintain the child in question; it being likewise true that the defendants who have no children of their own are also suitable and proper persons to retain the custody of the child, and are able to support and maintain him. The defendants own their own home, and unencumbered, and are active workers in the church, and are earning an ample income to properly minister to the needs and welfare of this child whom they are endeavoring to rear and provide for in a suitable and

proper manner. Moreover, it is a material circumstance, if the best interest of the child is to be considered, that in the home of the defendants he would be reared as their child and as bearing their name, whereas in the home of its mother it would be reared with another child who was born in wedlock and would become unhappy because of the disadvantage of being the illegitimate member of the household. The defendants have instituted an adoption proceeding in the chancery court, whereby they seek to have this child adopted, with the right of inheritance as their sole heir-at-law, and according to the testimony of the defendant, Fannie Williams, her reason for not having theretofore instituted an adoption proceeding is the fact that the mother of the child desired to conceal her identity as such by not having her name disclosed in court at the hearing thereof, and has also desired to keep her identity as its mother a secret until after the child had reached the age of more than three years, not having theretofore shown any intention other than to permanently abandon it.

Much is made of the fact that the defendant, Fannie Williams, was willing to cooperate in the matter of causing a false record to be made as to the parentage of this child, but the trial judge was entitled to take into consideration that the mother was equally guilty and that the foster parents had undertaken to rear two or three other children prior to that time and that they were in time taken from them by their parents; that Fannie Williams perhaps thought that in consenting to a birth certificate to be filed as a public record in that form, at the instance of the mother, she might be able to safeguard against this one being later taken from her. Under all of the facts and circumstances testified to, both pro and con, we are of the opinion that the decision of the trial judge should not be disturbed and that the judgment appealed from should therefore be affirmed.

Affirmed.

**Roberds, Hall, Lee, Kyle, Holmes** and **Arrington, JJ.,** concur.