**Marian F. REIMCHE,**
**Plaintiff-Appellant,**

v.

**FIRST NATIONAL BANK OF NEVA-**
**DA, Executor of the Estate of Marcus**
**Daly III, Deceased, and Candace Ma-**
**rie Daly, a minor, Defendants-Appel-**
**lees.**

No. 73–1740.

United States Court of Appeals,
Ninth Circuit.

Feb. 25, 1975.

Ralph M. Crow (argued), of Ross & Crow, Carson City, Nev., for plaintiff-appellant.

Melvin D. Close (argued), of Jones, Jones, Close, Bilbray, Kaufman & Olsen, Las Vegas, Nev., for defendants-appellees.

OPINION

Before LUMBARD,* KOELSCH and WRIGHT, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Plaintiff-appellant, a California resident, sought in this diversity action specific performance of a contract to make a will allegedly entered into between her and the late Marcus Daly III. Joined as defendants were the corporate executor of Mr. Daly's estate, his wife at the time of death and a daughter, alleged to be the child of the plaintiff by Mr. Daly. The district court dismissed the amended complaint on motion of the appellees on the ground that it failed to state a claim. We reverse.

■ For purposes of review, we must take as true the facts as alleged in the amended complaint; Walling v. Beverly Enterprises, 476 F.2d 393 (9th Cir. 1973). Appellant alleged that she and the decedent were involved in an adulterous relationship in 1954 while both were married to other persons. Appellant had been abandoned by her husband during this period. She supported two small children, a sister, and a widowed mother in California by working as a waitress in Reno, Nevada. An alleged promise of marriage by the decedent was withdrawn because of his inability to obtain a satisfactory property settlement with his then wife.

Appellant moved to California at decedent's request when they learned

* Senior Circuit Judge for the Second Circuit.

that she had become pregnant by him. The decedent allegedly supported her and provided for her medical costs during the pregnancy. Before the birth, decedent asked that the appellant consent to his adoption of the child, not seek to regain custody, and remain silent about the parentage of the child during his lifetime. In return, the decedent allegedly promised to rear, support, educate and maintain the child,

> leaving to the child and the Plaintiff all of his estate the same as if they were married, or in the alternative, leave all of his estate to the child and the Plaintiff, and any widow who survived him, other than the Plaintiff.

Amended complaint, CR 126.

The appellant acceded to this arrangement and the decedent subsequently adopted the child and provided for her in his will. He made no provision for appellant, however.

The district court dismissed the amended complaint, holding that it was against public policy to enforce a contract by the father of an illegitimate child to provide for the mother in his will if the contract was incident to an adoption agreement. This decision was based on a misinterpretation of the case law relating to public policy in this area.

There are no Nevada statutes or cases indicating state policy with respect to the propriety of such a contract. Contracts to make a will, however, are permitted, Waters v. Harper, 69 Nev. 315, 250 P.2d 915 (1952). But Nevada statutes do recognize the distinction between adoption agreements involving the natural parents of the child and those involving third parties. Parents placing their own children are exempt from the licensing requirements necessary for persons who place children for adoption, N.R.S. 127.240(1) and from criminal sanctions for receipt of compensation by unlicensed persons arranging for the placement of children, N.R.S. 127.300(2). Mothers of illegitimate children are permitted to agree on support arrangements by putative fathers, N.R.S. 126.280.

The Nevada case relied upon by the district court is inapposite. In Las Vegas Sun v. Franklin, 74 Nev. 282, 329 P.2d 867, 872 (1958), the court in a libel action held that there was no proof of the "black-market sale" of a child "in the absence of proof of a sale price or profit . . ." The basis of the alleged libel was the placement of the child with an unrelated person for adoption. The case is not precedent in a situation involving an adoption agreement between the natural parents of an illegitimate child. Moreover, the decision did not relate to circumstances in which there was other consideration for the payment besides mere consent to the adoption by the mother.

No decisions in other jurisdictions involving similar facts have been discovered. Some principles can be gleaned from cases in related areas.

Courts have upheld support agreements between the natural parents of illegitimate children based on consideration provided by the mother's forbearance from instituting filiation proceedings. Schumm v. Berg, 37 Cal.2d 174, 231 P.2d 39 (1951), Peterson v. Eritsland, 69 Wash.2d 588, 419 P.2d 332 (1966), 20 A.L.R.3d 512 § 4. Here the plaintiff necessarily surrendered all support rights against the decedent by permitting the adoption and remaining silent about her daughter's paternity rather than instituting a filiation proceeding.

Similarly, courts have approved contracts to devise between parents of illegitimate children based on the mother's forbearance from instituting filiation proceedings and consent to adoption, Redmon v. Roberts, 198 N.C. 161, 150 S.E. 881 (1929); Smith v. Wagers' Administrators, 238 Ky. 609, 38 S.W.2d 685 (1931).

Other courts have upheld adoption agreements between parents of illegitimate children, permitting the children to share in the fathers' estates despite a lack of formal adoption proceedings, and holding that the mothers' surrender of the children provided valid consideration for the contracts. Doty's Administrators

v. Doty's Guardian, 118 Ky. 204, 80 S.W. 803 (1904); Couch v. Couch, 35 Tenn. App. 464, 248 S.W.2d 327 (1951).

The courts in Georgia have prohibited adoption agreements involving some financial benefit to the mother where the adoptive parent was not the natural parent of the child. Downs v. Wortman, 228 Ga. 315, 185 S.E.2d 387 (1971); Savannah Bank and Trust Co. v. Hanley, 208 Ga. 34, 65 S.E.2d 26 (1951). Courts in other jurisdictions have permitted mothers to regain custody of their children after agreeing to surrender custody to third parties, Walker v. Williams, 214 Miss. 34, 58 So.2d 79 (1952); In re Guardianship of Fox, 212 Or. 80, 318 P.2d 933 (1957).

In a case closer to our facts, the Supreme Court of Kansas in In re Shirk's Estate, 186 Kan. 311, 350 P.2d 1 (1960), upheld an oral contract in which the adoption of a child by its grandmother was conditioned on granting both the child and its mother a one-third interest in the grandmother's estate. The court, citing 39 Am.Jur., Parent and Child, § 30, held that

a contract, whether an adoption contract or merely an agreement for the transfer of the custody of the child, is not [against public policy] *merely because it provides for the surrender by a parent of his child to another in consideration of the latter's promise to give or leave money or property to the parent or to the child, where it appears that the contract is in fact one which is promotive of the welfare and best interests of the child, and especially where the parent is not in a position to furnish proper care for the child and the promisor is able and fit to perform the obligation.*

350 P.2d at 11.

The court distinguished the case in which the child was surrendered for adoption to a stranger, holding that the "instant case involves a family compact." 350 P.2d at 12.

The court in *Shirk's Estate* also found significant the facts that the adoption request was initiated by the grandmoth-er, including the promise of a share of her estate, that it was not prompted by self-seeking on the part of the mother, and that the "controlling consideration" was the welfare of the child, *id. See also* Clark v. Clark, 122 Md. 114, 89 A. 405 (Ct. of App. 1913) and Enders v. Enders, 164 Pa. 266, 30 A. 129 (1894). Although the court noted that the mother already had a right to share in the grandmother's estate by intestate succession, this seems rather meaningless since implicit in the offer of a share in the estate was the prospect of explicit disinheritance.

The court found additional support for the agreement in the fact that the mother had surrendered "the control, custody, and daily companionship of her daughter. She lost the privilege of watching her grow and develop and the love and affection of the child for her was lessened." 350 P.2d at 9.

We conclude then that it is not against public policy to enforce an agreement to provide for the mother of an illegitimate child in the putative father's will, incidental to an agreement to permit the adoption of the child by its father, where the adoption was in the best interests of the child and pecuniary gain was not the motivating factor on the mother's part. The fact that the agreement was not initiated by the mother is evidence of the motivation behind the agreement.

Here the appellant alleges that she was in dire financial straits and had been abandoned by her husband while the decedent offered the prospect of a stable home and a secure financial position. She alleges further that she accepted the agreement offered by the decedent only when a prior offer of marriage was withdrawn by him. The appellant incurred a significant detriment by foregoing her right to child support through filiation proceedings, relinquishing the companionship and affection of their child as well as any financial compensation she might have obtained from her daughter's earnings during minority and her support obligations thereafter.

Since there is no Nevada public policy apparent from its statutes and case law, it was error for the district court to find that Nevada would reject the majority rule with respect to a compact between parents such as this. The fears that approval of such a policy would lead to the bartering or sale of children are not borne out where we deal only with agreements between parents or close family members. The appellant should have an opportunity to prove her allegations.

Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

KOELSCH, Circuit Judge (dissenting):

I respectfully dissent.

This is a disturbing case; appellant presents a sympathetic plea for relief. If the allegations of her complaint are true, she has undoubtedly suffered because of the circumstances which led her to give up her daughter. The daughter has fared well as a result of the bargain. Were it our function to cure past injustices, I might join the majority in providing appellant some monetary compensation for her sacrifice on behalf of her daughter.

But that is not our function. We sit here to review a decision of the district court, sitting as a court of equity, in a diversity suit. We may best perform that task, particularly, in "close" cases of this nature, and maintain a consistent, justifiable body of law, if we are careful to observe the institutional limitations on our authority to substitute our judgment for that of the district court, and if we are careful to apply rules of substantive law in a manner which can be justified in general application. The majority strays in both regards.

This suit, despite its subject matter, is a simple contract action. Appellant and decedent allegedly entered into a contract whereby appellant agreed to relinquish custody of the child to decedent, and refrain from creating a scandal, in return for decedent's promise to adopt the child, accord it the advantages his wealth allowed, and on his death leave his estate in equal parts to his wife, the child, and appellant. This suit seeks specifically to enforce the promise to provide by will for appellant. Enforcement of the covenant is here opposed solely on the ground that the promise providing compensation to the mother in connection with her relinquishment of the child violated public policy against the purchase and sale of children.[1]

As noted, this is a diversity suit; the law of Nevada applies. The local district judge concluded that the law of that state proscribed receipt by a mother of any consideration which allowed her to profit from childbirth (thereby characterizing her agreement to relinquish custody "a sale"), and that the covenant providing for the mother was illegal. Relying on familiar contract principles, he refused to enforce the illegal promise and dismissed the complaint. *See* Restatement of Contracts § 606 (1932); 6A Corbin, Contracts §§ 1521–22, at 758 et seq. (1950); Kessler v. Jefferson Storage Corporation, 125 F.2d 108 (6th Cir. 1941). The majority now overturns that decision, ostensibly on the ground that the experienced judge was wrong in his determination of the public policy of Nevada. In doing so, I submit the majority oversteps its bounds.

"The rule in this circuit is that

" 'In diversity cases, where state law controls, a district judge's interpretation of the law of the state where he sits will not be overturned unless clearly wrong, particularly if the

---

1. There is no issue of consideration present in this case; the promise to devise to appellant was clearly supported by a corresponding detriment on her side. Unfortunately the majority conflates the issues of consideration and illegality. The fact that the mother gave up a thing of value in relinquishing the control and companionship of her daughter is irrelevant to the inquiry into whether or not public policy is offended by her giving that thing of value up for a monetary profit.

highest state court has not passed on the matter.' "
Funk v. Tifft, No. 73–1785 (9th Cir., Jan. 22, 1975), at 5 (Wright, J., dissenting), quoting Douglas v. Beneficial Finance Co. of Anchorage, 469 F.2d 453, 455 (9th Cir. 1972). Turnbull v. Bonkowski, 419 F.2d 104, 106 (9th Cir. 1969), and cases there cited. *See* Propper v. Clark, 337 U.S. 472, 486, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949); Bigjoe v. Pioneer American Insurance Co., 446 F.2d 28, 29, 30 (9th Cir. 1971). All agree that there is no Nevada case or statute expressly covering the precise situation we face here; indeed, no case has been found from any jurisdiction which is directly in point.

The district judge's conclusion is nevertheless well-grounded in Nevada law. The judge relied on Nevada statutes regulating adoption, such as N.R.S. 127.285, which prevents an attorney from receiving fees for "finding" children for adoption; N.R.S. 127.290, which restricts receipt of compensation, for assisting in placing a child for adoption, to licensed child placement agencies to cover operating expenses; and N.R.S. 127.-300, which provides criminal penalties for unauthorized receipt of compensation in connection with the placement of a child for adoption, for his conclusion that the public policy of Nevada is violated by receipt of such compensation.

The judge also relied on Las Vegas Sun v. Franklin, 74 Nev. 282, 329 P.2d 867 (1958). In that decision the Nevada Supreme Court held that a newspaper's accusation that an attorney had facilitated an unwed mother's "black-market sale" of her child was libelous per se. The newspaper's defense of truth, based on the fact that the adoptive parents had paid the mother relinquishing the child $300 for her loss of wages during confinement, was rejected, the court commenting:

"Appellants contend that the compensation paid for the loss of wages amounted to a profit and constituted the transaction a sale. In absence of statute the determination of whether such compensation was proper rested in the first instance with the jury. We shall not disturb their determination . . . that such compensation did not constitute the transaction a sale. There is nothing to indicate that the payment permitted the mother to profit from childbirth. To the contrary, it would seem to have been intended simply to prevent her confinement from resulting in pecuniary loss." 329 P.2d at 872.

From this the district judge concluded:

"The negative inferences to be fairly drawn from the quoted comments are that a consideration which would permit the mother to profit from the placement, as opposed to a defrayment of the reasonable losses and expenses incurred in childbirth, would characterize the transaction as a sale. This conclusion accords with the weight of case authority. 59 Am.Jur.2d § 34, p. 117."

And, in light of the fact that the Nevada Supreme Court considered an accusation of child-selling to be a charge which was libelous per se, the district judge concluded that a situation in which the mother received a consideration for the consent to adoption was contrary to the public policy of Nevada. He therefore refused to enforce the covenant providing such compensation to appellant.

I am persuaded that the statutes and case relied on by the district judge fully support his conclusion. Moreover, as the onus is on the majority's rejecting that conclusion about state law to demonstrate it "clearly wrong," I am certain that conclusion cannot be disregarded; the majority has altogether failed to point to anything in Nevada law indicating support for a different conclusion. While it is true, as the majority emphasizes, that none of the indicia of Nevada law relied on by the district judge directly express a policy against receipt of compensation by a relinquishing parent under the narrow circumstances presented here—adoption by a natural parent which is in the child's pecuniary best interest—it is likewise certainly the case that the majority has pointed to nothing,

and so far as I can determine there is nothing, to indicate that Nevada would accept any qualifications on its general policy against the receipt of compensation in connection with the transfer of custody of a child.

Certainly none of the statutes relied on by the district judge make any such distinctions—unauthorized receipt of compensation remains criminal regardless of whether or not the child has been placed in a good home, or who pays it.[2] The statutes most directly in point, N.R.S. 127.290 and 127.300(1) and (2), not only do not support the majority, but appear explicitly to proscribe the compensation promised here. N.R.S. 127.290 prohibits, and 127.300(1) makes criminal, the receipt, directly or indirectly, of any compensation or thing of value by an unlicensed person for placing or arranging the placement of a child for adoption; appellant being unlicensed, the statute on its face applies to her. The present Nevada adoption statute was adopted in 1963 as a thorough revision of previous Nevada law, and was aimed in large part at eliminating abuses connected with baby-selling. The major impetus for the revision was a report of the Nevada Legislative Counsel Bureau to the Legislative Commission detailing prior problems and abuses and proposing the new law. Mitler, Nevada Legislative Counsel Bureau, Bulletin No. 58, Child Welfare and Adoption in Nevada: A New Law and a New Approach (1963). That report, while indicating that the major thrust of the anti-compensation provisions was to make illegal payments to middlemen who served as brokers in the baby market, and that prosecution of natural and adoptive parents was impractical and undesirable, nevertheless

clearly indicates that payments to natural parents were not to be excepted from N.R.S. 127.290. *See Mitler, supra,* at 31.

Furthermore, N.R.S. 127.300(2) does not, as the majority contends, exempt parents "from criminal sanctions for receipt of compensation by unlicensed persons arranging for the placement of children . . . ." In fact, the section provides that the natural and adopting parents shall not be considered accomplices under N.R.S. 127.300(1); it does not expressly absolve the parents as principals if they personally receive the compensation. Mitler indicates the provision was necessary because:

"Many black market baby trials have ended in acquittals because most of the witnesses were adoptive couples and natural parents who could be considered under the law accomplices to the intermediary and their testimony required independent corroboration. This corroboration is often impossible to secure." Mitler, *supra,* at 31.

As the major target of the law was the middleman, the parents making payments were not to be considered accomplices for making or receiving the payment in question in order to facilitate prosecution of the middleman, but were not exempted from liability for receipt of compensation if prosecuted directly. In sum, Nevada allowed parents to participate in adoption proceedings without becoming licensed, *see* N.R.S. 127.240, but restricted the receipt of compensation to licensed agencies, limited only to that necessary for operating expenses, N.R.S. 127.290, proscribing such compensation to all others, including appellant here. N.R.S. 127.300.

The statute contains no exceptions of the sort engrafted by the majority.[3] We

2. N.R.S. 127.240(1) excuses the parent or guardian from the licensing requirement imposed on others engaged in placing children for adoption; it provides no support for the majority's conclusion that compensation paid between the natural parents is less offensive to Nevada policy than that paid between strangers.

3. Even were N.R.S. 127.300, prescribing criminal penalties for violating the prohibitions of

N.R.S. 127.290, ultimately construed not to apply to our facts, that would not of itself invalidate the district court's conclusion that such compensation violated Nevada's public policy. Not only does N.R.S. 127.290 remain applicable, but there are also undoubtedly reasons for excluding parents from the reach of such a criminal statute consistent with a continuing disapproval of parental receipt of compensation for transfer of custody of a child.

are here concerned with Nevada law—not with general law or with what the majority considers the best policy.

As I understand its decision, the majority, being of the opinion that Nevada cases and statutes are not sufficiently explicit, has turned to various decisions of courts of other states and has concluded that a "majority rule" exists permitting compensation and that Nevada would follow the "majority rule."

The general statement found in American Jurisprudence 2d, 59 Am.Jur.2d, Parent and Child § 37, at 119–120, states the rule which the majority quotes from In re Shirk's Estate, 186 Kan. 311, 350 P.2d 1 (1960), and upon which the majority primarily relies:

"A transaction which in substance amounts to a sale of a child is, of course, contrary to public policy. In a number of jurisdictions, however, the courts have held that a contract, whether an adoption contract or merely an agreement for the transfer of the custody of the child, is not brought within this rule merely because it provides for the surrender by a parent of his child to another in consideration of the latter's promise to give or leave money or property to the parent or to the child, where it appears that the contract is in fact one which promotes the child's welfare and best interest. This is especially clear where the parent, at the time of the agreement, was not in a position to furnish proper care for the child, but the promisor was able and fit to assume this obligation." (footnotes omitted)

Enforcement of a contract to give or leave property to the child whose custody is transferred involves a different issue of policy than enforcement of a provision providing compensation to the parent relinquishing custody; no sale is involved in the former, and we are not here concerned with such contracts.[4]

As for the latter, there are, so far as I have been able to discover, only three cases in which the courts have enforced contracts compensating the parent relinquishing custody of a child. Each of those cases is clearly distinguishable from the instant one. Neither Clark v. Clark, 122 Md. 114, 89 A. 405 (Ct. of App. 1913), nor Enders v. Enders, 164 Pa. 266, 30 A. 129 (1894), involved an adoption contract. Both involved situations in which a mother agreed to allow a grandparent to keep the child in the grandparent's home and raise it. In neither case did the parent, as here, legally relinquish parental rights and responsibilities to the child. In *Enders*, on which *Clark* relied entirely, the agreement allowed the mother to visit the child whenever she desired, take the child to her home whenever she pleased, and in general maintain her maternal relationship to the child. In enforcing the grandfather's promise to pay the mother money, the *Enders* court decided that the natural tendency of the contract was not violative of public policy, because the promised payment to the mother was not made in return for an extinguishment of the mother's "parental solicitude and affection." 30 A. at 130. Here it was: for all its supposed virtues, the contract between appellant and decedent clearly contemplated a permanent termination of the relationship between the child and its natural mother, and thus falls afoul of the solicitude displayed by the *Enders* court that the payment not be for a termination of the parental relationship.

*Shirk's Estate* can be distinguished on a similar basis. There, the adoption contract between grandmother and mother contained a provision that the mother, who was recently divorced, could, when she settled down and remarried, readopt her daughter, indicating that permanent severance of the mother's ties to the child was not bargained for or contemplated. Indeed, the mother did readopt her daughter, with the grandmother's consent, some two years after the initial adoption, and some 15 years before the lawsuit was brought.

4. The reason for refusal to enforce the illegal bargain, that the court does not want to lend its process to the wrongdoer, applies to the parent who has bargained away the child, but does not apply to the child whom the "no-sale" rule is designed to protect.

Moreover, in *Shirk's Estate* the consideration promised the mother under the agreement was the same share of the grandmother's estate she would normally expect to receive under intestacy. She was to receive a third of the estate; her brother, a third; and her daughter, a third—the same share to which each would be entitled upon the grandmother's adoption of the child, as she thereupon became an heir entitled to a child's share of the estate under intestate succession. The Kansas court stated:

> "It is fundamental that parents may not barter or sell their children nor may they demand pecuniary gain as the price of consent to adoptions. This is so inherent in the fabric of American law that citation of authority is unnecessary." 350 P.2d at 11.

But the court went on to indicate that it did not consider the promised share of the estate a pecuniary gain of the sort proscribed:

> "Any benefits the mother was to receive under the contract were secondary and incidental to its principal purpose since the share promised her was just what the law would have given her had the grandmother then died intestate, and what, in all probability, she would sometime receive unless the grandmother, in violation of the contract, disinherited her or diminished by will the share which would have come to her in case of the grandmother's intestacy . . . .

> . . . . . .

> "The grandmother's promise was not to give the mother any part of the property which she then possessed, but to see that at her death the mother would receive one-third of her estate. . . . Had the mother gained something in addition to the share to which she was entitled as a daughter, then the executor's conclusion that 'the child was a means to securing a desired end' might be proper. But, the mother gained nothing more than that which she was morally and legally entitled. Actually, by consenting to the adoption she reduced her share as a daughter and heir at law from one-half to one-third." 350 P.2d at 12, 13.

Such is of course not the case here. Appellant was not entitled to any part of the decedent's estate absent the contract. The majority attempts to minimize this distinction by arguing that "implicit in the offer of a share in the estate was the prospect of explicit disinheritance." The fact of the matter is that no explicit threat of disinheritance was made at the time the contract was entered into, nor do the facts reveal that such a threat was implicit in the negotiations. The fact that the grandmother then confirmed to her daughter that she would receive her third of the estate does not necessarily establish that there was a concomitant implicit threat of disinheritance if the daughter did not accede to the grandmother's desires. Certainly the majority must recognize that there are many families in which the ebb and flow of family relationships, of vacillating parental approval of a child's conduct, is not accompanied by implicit threats of disinheritance. (It may be as readily assumed that the parent will ultimately forgive and forget and pass property to the child.)

If the majority is going to rely on *Shirk* as an expression of a general public policy towards contracts of this sort, it should take the precedent as it finds it. Laws of intestate succession express and confirm a fairly widely held moral notion that a parent's property should pass to the child, a notion presumably shared by parents, and which they will act upon. The Kansas court apparently believed that it was of considerable, indeed controlling, significance that the mother bargained only for the share to which the laws of Kansas intestate succession recognized in her a moral entitlement, and which she ultimately might receive anyway, contract or not. The majority disregards that difference in an effort to equate the free and clear third of the estate bargained for here with that bargained for in *Shirk's Estate*. But the two are not comparable—the

public policy precluding compensation to a mother, so that she will not be improperly swayed to abdicate her responsibilities to the child, is certainly less offended if the compensation is something she might receive anyway, and to which the state, through the laws of intestate succession, has recognized in her some valid claim.

The major difference between this case and those on which the majority relies, however, is that here enforcement of the appellant's contractual claim may be at the expense of the child. She is named as a defendant in this action, as under decedent's will she is to receive a portion of his estate. It is quite likely that enforcement of the covenant will reduce the child's share of the estate. Such was not the case in *Shirk, Clark,* or *Enders.* If so, none of the cases relied on by the majority justify finding a covenant harmful to the child's present interests enforceable, and such a holding would fly directly in the face of well-established legal principles.

The general rule governing all contracts, including the one here, respecting the custody of a child is that such contracts are not binding on the courts, either when made between parents or between a parent and a third party. 59 Am.Jur.2d, *supra,* §§ 33, 34, at 116–118; Ford v. Ford, 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1962); Restatement of Contracts § 583 (1932). "The custody and welfare of children are not the subject of barter." *Ford, supra,* at 193, 83 S.Ct. at 277, quoting Buchanan v. Buchanan, 170 Va. 458, 477, 197 S.E. 426, 434 (1938). Parents may not treat children as chattels; the state retains a paramount interest in the welfare of the child which may not be defeated by the parent's contract. "[E]xperience has shown that the question of custody, so vital to a child's happiness and well-being, frequently cannot be left to the discretion of parents." *Ford, supra,* 371 U.S. at 193, 83 S.Ct. at 277. *See* Barwin v. Reidy, 62 N.M. 183, 307 P.2d 175 (1957). Thus, in virtually every American jurisdiction the terms of a contract respecting custody are subject to being disregarded by the court to advance the child's welfare. *Ford, supra,* 371 U.S. at 193, 83 S.Ct. 273. Such a contract is considered either illegal, *see* Restatement, *supra,* § 583(1), or at least voidable *ab initio.* In each instance, the provisions of the contract are enforced only if performance of the bargain benefits the child.[5]

Applying that principle, I am clear, even assuming that the over-all contract between appellant and decedent was beneficial to the child, thus making the contract legal, and further assuming that a covenant providing compensation to the relinquishing parent is valid, that if the court is asked to enforce a provision detrimental to the child's interests, the court has the right and the obligation to refuse to enforce it. The provision appellant seeks to enforce here retains its character as a part of a custody-related contract. " '[T]he rule [is] that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. *All other matters are subordinate.*' " (Emphasis added) *Ford, supra,* at 193, 83 S.Ct. 276, quoting Mullen v. Mullen, 188 Va. 259, 269, 49 S.E.2d 349, 354 (1948). As the situation under the

---

**5.** The Restatement provides:

"§ 583. Bargain for Custody of Minor Children.

"(1) Except as stated in Subsection (2) a bargain by one entitled to the custody of a minor child to transfer the custody to another person, or not to reclaim custody already transferred of such a child, is illegal unless authorized by statute.

"(2) A bargain by one parent to transfer the custody of a minor child to the other parent or not to reclaim such custody is not illegal if the performance of the bargain is for the welfare of the child.

"*Comment*:

"a. Like marriage, the custody of young children is of importance to the State. It is not a property right of the parents. The court may, if it is for the welfare of the child, enforce the bargain, but will not do so otherwise. . . . ."

will is presently unclear, the possibility of harm to the child does not, of itself, require dismissal of the complaint at the present time (although other independent reasons amply mandate that course). Nevertheless, if it results that enforcement of the covenant in appellant's favor will diminish the child's share of the estate. I believe it would be a clear abuse of discretion to grant specific enforcement of the decedent's promise. Despite the majority's failure to confront the issue, I do not understand it to rule otherwise.

I have a further objection to the course taken by the majority. Even if there were a "majority rule," Nevada would not necessarily follow it. As noted earlier, if a state is undecided on an issue of law, the responsibility rests upon the district court to predict the course that the state will follow. A supposed rule in other jurisdictions is instructive, but certainly not binding. Particularly where a close question is involved, the district court may conclude that the state would follow a "minority rule." In that event, our task is not to decide de novo what we consider the preferable rule, but to decide whether the district court was "clearly wrong." In performing that task, it is particularly relevant to consider the various reasons supporting the "minority" view; we should overturn the district court only if the minority view is untenable. Here there are a number of compelling reasons for upholding the district court's decision.

The so-called "majority rule" is rejected almost as often as accepted. Texas holds that any contract by which a parent surrenders custody is wholly void as against public policy, regardless of the financial prosperity thereby visited on

the child, and will not allow enforcement of the contract even by the child, much less the parent. Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 1118 (1921).[6] *See also* Willey v. Lawton, 8 Ill.App.2d 344, 132 N.E.2d 34 (1956). The Georgia courts will allow the child whose custody is transferred to enforce a covenant to devise property to it, Savannah Bank & Trust Co. v. Wolff, 191 Ga. 111, 11 S.E.2d 766 (1940), but hold that a provision providing consideration to the parent is void as against public policy, regardless of whether or not the contract was of benefit to the adopted child. Savannah Bank & Trust Co. v. Hanley, 208 Ga. 45, 65 S.E.2d 26 (1951).[7] Moreover, in Kansas, the jurisdiction in which *Shirk's Estate* was decided, decedent's promise to devise to appellant would be void because it is in derogation of the adopted child's statutory rights of intestate succession. In Bilderback v. Clark, 106 Kan. 737, 189 P. 977 (1920), the Kansas court held that any adoption agreement which diminishes the share the adopted child would otherwise be entitled to as the heir of the foster parent is void as against public policy. The court stated:

"It is elementary law that the aim and end of adoption statutes is the welfare of children. The theory of the adoption statute is that such welfare will be best promoted by giving an adopted child the status of a natural child. An incident of that status is capacity to inherit in case of the parent's intestacy. . . . The statute establishes the public policy of the state, and any contract between the parties interested in an adoption proceeding which would make the result of the proceeding contradict the stat-

---

**6.** This rule is followed by a few courts. *See* Restatement of Contracts § 598, Comment a (1932). *See* n. 4 *supra.* Courts ordinarily allow the child to recover on provisions of adoption contracts which benefit it, generally on third party beneficiary logic.

**7.** The court in *Hanley* stated:

"So much of the present contract as provided that the mother agreed to surrender

possession of the child in consideration of a legacy that was to be made to her and a brother and sisters of the adopted child, was void as being against public policy. This is true for the reason that to hold otherwise would· open the door to the unlimited barter of children. The fact that it was alleged that the adopted child in the case under review received great benefits does not require a different ruling." 65 S.E.2d at 29.

ute contravenes that policy. It is perfectly true that a foster parent may, by various means, deprive his adopted child of its expectancy, just as a natural parent may disinherit his own child. The fortunes of the child are left to parental consideration; but the fortunes of the child must have parental consideration, and no preadoption contrivance can thwart fullfilment [sic] of the statute by embarking an adopted child upon its career stripped of the attributes and privileges of an heir.

". . . [I]t may well be doubted that a parent may barter his child to adoption by another for any valid consideration other than benefit to the child. However this may be, a preadoption agreement which undertakes to place a child in any other relation to its foster parent than heir cannot be claimed as a consideration for yielding consent to adoption. If by oral bargain, concealed from the court solemnizing the adoption, a parent may sell his child for a share of the child's prospective patrimony, as the contract in this case contemplated, welfare of children may become a mere incident instead of the desideration of adoption proceedings." 189 P. at 980.

The rule stated did not apply in *Shirk's Estate* because there, upon adoption of the child, she became one of three natural heirs of the grandmother, and her expectancy under the contract was the same as that under intestacy. Here, were it not for the adoption agreement, the child would upon her adoption have been entitled to one-half of decedent's estate under the Nevada law of intestate succession,[8] N.R.S. 134.040(1). Appellant would have been entitled to nothing, and her contract with the decedent diminished the share the child might expect, thus violating the rule of *Bilderback,* and making the provision void in the *Shirk* jurisdiction.

Given the dubious validity or applicability of the "majority rule," and the split among the relatively few jurisdictions which have considered the question, the district court was certainly not "clearly wrong" in concluding that Nevada would not enforce the promise to devise to the relinquishing mother.

The majority says nothing in favor of the practice of a relinquishing parent's receiving compensation for consent to the transfer of custody of a child. It cannot; I am confident that every court in every jurisdiction in the United States would find that such a promise, standing by itself, violates a strong public policy against the sale of children. Rather, the majority predicates its decision on the notion that the covenant, although while standing alone would violate public policy, becomes inoffensive if the contract taken as a whole is beneficial to the child. The general contract rule, however, is to the contrary. A provision of a contract which is illegal standing alone does not become enforceable if the contract on balance is benevolent. Rather, if the contract is divisible, with consideration supporting two promises, one of which is illegal, a plaintiff may sue to enforce the legal promise, but the illegal one fails. If the contract is not divisible, none of its covenants are enforceable. Restatement, *supra*, §§ 606, 607; Corbin, *supra*, § 1522. Applying that principle here, decedent's various promises to benefit the child were legal, but the promise to the mother remains at all times illegal and unenforceable. Again, I doubt the district court was "clearly wrong" in deciding that Nevada would not deviate from such a widely accepted principle of contract law.

None of the appended benefits flowing to the child alter the basic fact that if the mother accepts any consideration for her consent to relinquish custody, she is to some extent "selling" the child. The law, of course, recognizes no property interest which she may sell, but it does

8. Nevada, like Kansas, provides that an adopted child inherits from his adoptive parents as if he were a natural child, and the

rationale of *Bilderback* is equally applicable here. See N.R.S. 127.160; N.R.S. 134.190.

enforce custodial rights and responsibilities over the child. In selling those she transfers the child as she would any other chattel. Such a transaction offends a fundamental operating principle of our legal system—that each individual is independent, equal, and free of the others, subject only to such custodial restraints as are imposed through laws enacted by the legislature, and not subject to the disposing whim of a legal equal. That principle is a wise one. It breeds humanity and mutual respect. By compelling recognition of the independence and inviolability of others, it puts iron in the operation of a democracy. Regardless of how metaphysical it may seem, and how innocuous a proposed deviation, it is a principle from which no departure should be tolerated. As the district court stated here:

> "If the abjuration of agreements involving the barter sale of human beings is as basic and fundamental as I think it is, in the light of case authority and the Thirteenth Amendment to the Constitution of the United States, an agreement for adoption which includes any substantial pecuniary advantage to the relinquishing parent which she would not be otherwise equitably entitled to as an expectancy or because of family relationship violates such fundamental public policy and cannot be enforced."

Moreover, the incentive to the mother permitted by the majority has no proper place in Nevada's scheme of legislation protecting the child. As previously pointed out, child custody, welfare, and adoption are not areas where private ordering and arrangement predominate. All states thoroughly regulate the subject to protect the child, overriding private arrangements with public law. Nevada has a comprehensive system of laws governing all aspects of child custody and adoption, passed on the basis of various judgments as to the approaches which will best protect the child; the laws attempt to ensure that all of the child's needs are met. In that context the court's function is not to protect the child by facilitating ad hoc private arrangements, but rather to fashion corollary rules which will conform to and advance the state's legislated approach. The type of incentive provided by the majority is not only not needed to protect the child, but is in fact inconsistent with the general thrust of Nevada's statutory scheme.

Nevada's child welfare laws generally enforce and protect the natural relationship, taking the view that the child is best protected by enforcing the natural bonds between parent and child.[9] The same is by and large true in the case of an illegitimate. Both parents owe the child maintenance, education, and support. *See* N.R.S. 126.030. However, primary custodial responsibility is placed on the mother, whose paternity is certain. Her custody is subject to the father's ability to establish parental rights, *see* N.R.S. 41.530, and she may establish the father's paternity to compel support, *see* N.R.S. chapter 126, but she alone *retains* custody unless the father seeks it, or unless the court orders otherwise. *See* N.R.S. 126.290.[10]

Nevada's statutory scheme, in giving her custody, places on the mother of an illegitimate the concomitant responsibility for making, objectively, decisions which affect the child's well-being. Most importantly for our purposes here, the mother by herself may consent to the adoption of the illegitimate child, unless the father chooses to establish parental rights. N.R.S. 127.040(1)(c).

Adoption is a serious matter; it cuts off the favored natural relationship of parent and child. Nevada has rigorous

---

9. The natural parents are given custody and have concomitant obligations of support. And in custodial battles a strong presumption is recognized that the child's welfare will best be served by being in the custody of a natural parent. 59 Am.Jur.2d, Parent and Child §§ 25–27.

10. Additionally, the illegitimate child inherits as an heir from the mother but not from the father, unless the latter acknowledges paternity. N.R.S. 134.170. *See also* N.R.S. 134.180.

formal requisites for consenting to relinquish a child for adoption, see N.R.S. 127.053, indicating that the state does not intend the step to be lightly taken. (Presumably that is doubly true in the case of the mother of an illegitimate who, charged with deciding what will best serve the child, has the capacity to terminate the child's relationship to both natural parents, and who must make the decision alone.) Moreover, the state has various procedures designed to assure that the proposed adoptive parents are suitable. Private placements are an exception; most children are placed through licensed agencies,[11] which must make a thorough investigation of the prospective parents. See N.R.S. 127.120. In the case of a private placement an investigation is conducted by the state welfare division.

The fact that Nevada allows private placements by the natural parent as an exception to the requirement that placements be made through licensed agencies does not, I would think, evidence an intent to ignore the state's concern that the qualifications of the proposed parents be carefully considered. Rather, the state is to some extent relying on the natural parent's solicitude for the child to replace the special competence of the licensed agency. Thus, Nevada, by requiring her consent to the specific adoption proposed by the petition, N.R.S. 127.040(1)(d), places on the mother the initial responsibility to decide whether the child would be well off with the prospective adoptive parents. That decision entails more than financial considerations. By providing means of enforcing a father's financial responsibilities to an illegitimate, Nevada relieves the mother from purely financial compulsion to give up the child, and therefore allows her to consider qualities of the proposed adoptive parents other than their financial capacity. She must consider the whole spectrum of the child's needs, and balance all its prospects, whether financial, educational, cultural, religious, or any other. Ultimately, she must evaluate how well the adoptive parents can raise the child—whether they can replace her natural love for the child and give it the love, tolerance and guidance necessary for it to grow happy and whole. It is a delicate, perhaps imprecise, balance. But as the child's welfare is at stake, Nevada undoubtedly intends for the mother to weigh the child's interests as carefully as she is able.

In that light, it seems to me a very reasonable corollary that Nevada would not want or allow one-third of the Anaconda Copper fortune held by the decedent Marcus Daly to be dropped in the balance to sway the mother's judgment. Such financial considerations might very well buy a blind spot to qualities in the adoptive parent harmful to the child, and which the mother would not otherwise ignore. As stated by Mitler in his report for the Nevada Legislative Counsel Bureau:

"The real question is: Was the selection of the adoptive home influenced or determined by the compensation being given by an intermediary of the adoptive couple? If the sole reason for selecting an adoptive home was the ability of a couple to pay the intermediary one dollar, social damage has been inflicted." Mitler, supra, at 31.

While Mitler was addressing the child-selling abuses of middlemen paid by adoptive parents to "buy" a child, the underlying policy judgment, that money should not dictate the placement of an adoptive child, presumably translated into the Nevada law, remains the same here.

The majority apparently believes that the danger posed to the child does not warrant uniformly proscribing such com-

---

11. Indeed, under the Nevada statute as originally proposed by Mitler, no private placements would have been allowed at all. See Mitler, supra, at 14. Mitler took the position that very few private placements were legitimate, most merely serving to camouflage a sale. However, the legislature apparently felt that such sales could be prevented by other safeguards, and that the relinquishing parents' ability to choose specific adoptive parents was worth retaining.

pensation, because the court asked to enforce the promise may determine after the fact which contracts were beneficial to the child and enforce those, but refuse to enforce others in which the compensation promised the mother swayed her against the child's best interests, or in which her real motivation was her own pecuniary gain.[12]

But such after-the-fact review does not completely cure the vice at which it is directed. So long as the receipt of compensation is not entirely proscribed, the mother may be tempted to diminish the child's benefits under the contract and increase her own share. Our review to determine whether the adoption contract is on balance favorable to the child does not eradicate the potential in each case that were compensation to the mother entirely proscribed, the child might have done even better under the contract. The majority's rule creates a temptation, the marginal consequences of which are inimical to the child's welfare.

Moreover, after-the-fact review is inadequate and cannot replace the protection provided in the first instance by the mother's natural concern for the child. The majority, and the other courts which have faced the question, are forced to rely almost entirely[13] on the improvement in the child's financial situation to establish that the adoption contract advanced the child's welfare. But money is not the alpha and the omega of the matter. Surely the majority recognizes that an improvement in the child's financial position does not assure any improvement in its general well-being. Many factors other than money contribute to a child's ultimate happiness, the most important of which are personal intangible qualities a court is ill-equipped to weigh. The responsibility for weighing those factors is cast on the mother consenting to the adoption. On review years later, a court has no good way of judging the quality of her decision to relinquish custody—of weighing decedent's qualities as a parent against appellant's—and deciding whether the child might not have been better off, notwithstanding material improvements, had the parent not consented to the adoption.

As the decision on which course will best serve the child is made before the child is adopted, and as a court cannot later review that decision very well, it seems to me preferable for the Court to circumscribe the mother's initial decision with rules which ensure, insofar as possible, that she will weigh all considerations, tangible and intangible, solely on the basis of what is best for the child. The district court, by proscribing compensation to the mother, did so. The majority's approach manifestly does not. I believe that the district court's position is preferable because it advances the policies of Nevada's child welfare laws. But I am certain that the district judge was not "clearly wrong" in deciding that Nevada would choose his course.

There is no compelling legal reason to reach a conclusion different from that of the local district judge, and we should not do so. We cannot afford ourselves the luxury of ad hoc deviations from sound legal principles in order to reach sympathetic results; the price of such a course, in terms of the confusion and uncertainty introduced into the law, and

12. The majority's opinion seems to intimate that this contract is enforceable because as a matter of law it was in the child's interest, but I assume that remains a question of fact for the district court. As we are reviewing a judgment granting a motion to dismiss, we are required to take as true the allegations of appellant's complaint. On remand, however, I would think that the appellees might attempt to show that the contract was not in the child's best interests, or that the motivating factor on the appellant's part was pecuniary gain, and that the district judge will find the promise illegal, if he so finds.

13. The child's financial condition is an objective, readily ascertainable basis for comparison, all the more useful because other bases of comparison are generally unavailable; except in egregious situations, it is difficult, if not impossible, to determine how the child might have fared elsewhere when measured by other than financial criteria.

in terms of the eventual erosion of social values allowed by undermining the legal principles sustaining them, is too high.

I would affirm the judgment below.